**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gerald Bollfrass, et al., | No. CV-19-04014-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Before the Court are Defendants City of Phoenix, City of Phoenix Housing Department ("PHD"), Cindy Stotler, Keon Montgomery, William Emmerson, Veronica Grittman, Angela Hogan, Dina Fernandez, James Navarette, and Julie Bosshart's Motion for Summary Judgment (Doc. 163) and Plaintiffs Gerald Bollfrass and Frank Czyzewski's Motion for Partial Summary Judgment (Doc. 165.) For the reasons expressed herein, the Court grants Defendants' Motion for Summary Judgment in its entirety and denies Plaintiff's Motion for Partial Summary Judgment in its entirety.

## I.    PROCEDURAL HISTORY

On May 16, 2019, Plaintiffs filed a complaint in Arizona Superior Court asserting claims under 42 U.S.C. §§ 1983, 3604, 12132, and 1437. (Doc. 1 at 2.) Defendants removed the case to this Court, asserting jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). (Doc. 1.)

Plaintiffs filed a First Amended Complaint on June 24, 2019 (Doc. 18), and a Motion for Preliminary Injunction on July 29, 2019 (Doc. 22.) On September 3, 2019,

Plaintiffs' Motion for Preliminary Injunction was denied. (Doc. 37.) On December 19, 2019, Plaintiffs filed a Second Amended Complaint. (Doc. 57.) On January 9, 2020, Defendants City of Phoenix, PHD, Fernandez, Grittman, Bosshart, Navarette, Hogan, Montgomery, and Emmerson filed a Motion to Dismiss (Doc. 66) and on February 21, 2020, Defendants Stotler, McAbee, Martin, and the various Doe Spouse Defendants filed a separate Motion to Dismiss (Doc. 80.) The Court granted in part and denied in part both of those motions, dismissing some of Plaintiffs claims and Defendants McAbee, Martin, and Magaard. (Doc. 90.)

Plaintiffs filed a Third Amended Complaint ("TAC"), which is the operative complaint. (Doc. 136.) In response, Defendants filed a motion to dismiss Counts Four and Seven, and Defendant Emmerson's wife. (Doc. 140.) The Court granted that motion in its entirety. (Doc. 143.) The remainder of Plaintiffs' TAC is before the Court on summary judgment.

## II.   FACTUAL BACKGROUND

The facts summarized below, and detailed throughout this Order, are taken from the parties' summary judgment submissions and other documents in the record. The facts are undisputed, unless otherwise noted.[1]

Plaintiffs Czyzewski and Bollfrass are residents at Fillmore Gardens, a federally funded public housing project owned and operated by the City of Phoenix and PHD. (Doc. 136, ¶ 2.) Fillmore Gardens receives federal funding through participation in the United States Department of Housing and Urban Development's ("HUD") Federal Public Housing Program. (*Id.*)

---

[1] In response to Defendants' factual summary contained in their Motion, Plaintiff objects to several of Defendants' factual assertions as irrelevant, hearsay, not supported by admissible evidence, or not supported by any evidence at all. (Doc. 182 at 2–3.) In reply, Defendant responds to each objection, and reasserts their objection in their response to Plaintiff's Partial Motion for Summary Judgment that Plaintiffs' briefing is equally replete with objectionable citations to inadmissible hearsay evidence and mischaracterizations of the cited evidence. (Doc. 184 at 7–8.) Accordingly, the Court will not rely on any of either party's objectionable evidence in deciding whether either party is entitled to summary judgment. *See* Fed. R. Civ. P. 56; *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) ("When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment.").

1   The Individual Defendants each had respective roles within PHD at all relevant
2   times throughout the events alleged in this case as follows: Defendant Stotler was a PHD
3   Director; Defendant Montgomery was a PHD Deputy Director; Defendant Emmerson was
4   a PHD Deputy Housing Director until August of 2017; Defendant Grittman was a PHD
5   Housing Manager; Defendant Fernandez was a PHD Housing Supervisor; Defendant
6   Hogan was a PHD Housing Supervisor or Deputy Director; Defendant Navarette was a
7   PHD Property Manager; Defendant Bosshart was a PHD Casework Supervisor and
8   Program Administrator. (*Id.* ¶¶ 13–20.)

9   As summarized in an earlier order, the gist of the Plaintiffs' claims is that they were
10   subjected to Defendants' disparate treatment and retaliation for their community activism
11   at Fillmore Gardens, including, as alleged in the TAC, Plaintiff Czyzewski's termination
12   from his Resident Assistant ("RA") position, multiple lease violation notices, two notices
13   of eviction, an arrest, a financial audit of Plaintiffs', and the dissolution of the Fillmore
14   Gardens Resident Council ("RC") that they were active members of. (*See* Doc. 90 at 2–7.)

15   Throughout their tenure at Fillmore Gardens, Plaintiffs' were involved in two
16   physical altercations that resulted in police involvement (Doc. 163-2 at 277–81; Doc. 182-
17   1 at 135–207), sent numerous emails to PHD staff regarding confrontations with other
18   tenants (Doc. 163-2 at 43–44; Doc. 163-3 at 62, 64, 66, 68, 70–71), received two lease
19   violation notices for harassing behavior of other tenants and PHD staff (Doc. 163-2 at 43–
20   44, 312–13, 485; Doc. 163-3 at 70–71), failed to pay their rent on time (Doc. 163-2 at 423–
21   25; Doc. 163-4 at 31), and failed to report additional income as required by their lease
22   (Doc. 163-4 at 36–40.) One of those altercations disrupted a PHD manager's meeting and
23   resulted in Plaintiff Czyzewski's arrest for disorderly conduct after engaging in hostile
24   behavior toward Donna Magaard, another Fillmore Gardens resident. (Doc. 163-2 at 58–
25   83, 315, 470–73; Doc. 182-1 at 135–207.) Plaintiff Bollfrass used his position as RC
26   President to attempt to evict another tenant that he did not get along with. (Doc. 163-2 at
27   485; Doc. 163-3 at 79.)

28   Due to the complex nature of the timeline in this case and the several separate events

and claims, the Court will recount the additional relevant facts in the below analysis, as necessary.

### III.   LEGAL STANDARD

#### A.   Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. The court may grant summary judgment when the movant shows that (1) there are no genuine issues of material fact; and (2) when the evidence is viewed in the light most favorable to the non-moving party, the movant is entitled to a favorable judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). Material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact does not arise solely from allegations in pleadings; the non-moving party also must produce affirmative evidence to rebut the moving party's motion. *Id.* at 257. When deciding a defendant's motion for summary judgment, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff" to deny a defendant's motion. *Id.* at 252.

The facts the Court relies on herein are either undisputed or recounted in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). The Court notes that while the non-moving party is entitled to all reasonable inferences in its favor on summary judgment, the Court will not apply such inferences that clearly contradict the weight of the evidence in the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

#### B.   Section 1983 Claims

A plaintiff asserting a claim for relief under § 1983 must prove that: "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a constitutional right." *L. W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992). "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to

actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). State officials or municipalities are liable for deprivations of life, liberty, or property that rise to the level of a "constitutional tort" under the Due Process Clause of the Fourteenth Amendment. *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007) (citing *Monell v. Dep't of Soc. Serv. Of the City of New York*, 436 U.S. 658, 691 (1978)).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Qualified Immunity

Defendants assert that they are entitled to qualified immunity on Plaintiff's Due Process and First Amendment claims. (Doc. 163 at 38–40.) Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). While "[q]ualified immunity shields federal and state officials from money damages[,]" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011), it is "an immunity from suit rather than a mere defense to liability[,]" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Consequently, it "is effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231.

A district court evaluating whether a government official is entitled to qualified immunity at the summary judgment stage asks two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the official's conduct violated a federal statutory or constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Either question may be addressed first, and if the answer to either is "no," then the officials cannot be held liable for damages. *See Pearson*, 555 U.S. at 236. With respect to the second prong, "[b]ecause the focus is on whether the [official] had fair notice that her conduct was

unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). For this reason, the Supreme Court has emphasized the importance of ensuring the evidence is reviewed through the appropriate lens when deciding the "clearly established prong" on summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 657–58 (2014). "The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff*, 572 U.S. at 779). Thus, the second step in the qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "The 'clearly established' standard . . . requires that the legal principle clearly prohibit the [official's] conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Wesby*, --- U.S. ---, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). "This requires a high degree of specificity." *Id.* (internal quotation omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### 1.    Waiver

Plaintiff argues that Defendants waived any qualified immunity defense because they failed to seek resolution on this issue for more than two years since first mentioning the issue in an August 2020 Joint Proposed Case Management Report. (Doc. 182 at 14–15.) Defendants respond that Plaintiffs do not cite any cases to support their position that waiting to raise qualified immunity until the summary judgment stage results in waiver of that defense. (Doc. 184 at 3–4.) Regardless, without a showing that Plaintiffs have suffered

any prejudice, "an affirmative defense may be raised for the first time at summary judgment." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). Plaintiffs do not claim prejudice in their pleadings, nor is any apparent from the record. Thus, the Court finds that Defendants did not waive their qualified immunity defense and the Court can properly consider it on summary judgment.

### 2.    Due Process

Plaintiffs bring a claim for violation of Plaintiff Czyzewski's Fourteenth Amendment right to due process after he was terminated from his RA position. (Doc. 136, ¶¶ 212, 216.) As discussed in more detail in Part IV.B, *infra*, Plaintiffs fail to raise a disputed issue of fact as to whether Plaintiff Czyzewski had a protected property interest in his employment such that he was entitled to process before termination. Instead, the Court finds that Plaintiff Czyzewski was employed at-will for the duration of his employment as an RA, meaning that he could be terminated without notice for any reason or no reason at all.

Defendants argue that they are entitled to qualified immunity on Plaintiffs' due process claim because the Ninth Circuit recently held that "enunciating generalized due process principles" is "inadequate to clearly establish a right to the particular procedural protections" in the absence of case law establishing rights in an analogous factual context. (Doc. 163 at 38) (citing *Shooter v. Arizona*, 4 F.4th 955, 962 (9th Cir. July 22, 2021)). Defendants contend that Plaintiffs have failed to meet their burden to find a case clearly establishing the right to due process under similar circumstances. (*Id.*)

In response, Plaintiffs only state that the parties dispute whether the *Pickering* test applies to Plaintiffs' due process claim because Plaintiff Czyzewski was employed by a private company contracted to provide governmental services. (Doc. 182 at 15.) However, it is well-established that where the government contracts with private companies to hire independent contractors to perform government work, such persons are considered public employees for the purposes of establishing a violation of their constitutional rights by the government. *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1101 (9th Cir. 2011).

Plaintiffs do not address Defendants' arguments on the "clearly established" prong of the qualified immunity test or explain how the *Pickering* test for First Amendment retaliation is relevant to Defendants' qualified immunity defense to Plaintiffs' due process claim.

The parties do not cite to any authority, and the Court is not independently aware of any, that stands for the proposition that an at-will public employee has a due process right to notice and a hearing prior to being terminated. Indeed, as discussed in Part IV.B, *infra*, the inverse is true. *See Haglin v. City of Algona*, 42 Fed. Appx. 55, 57 (9th Cir. 2002) ("If employment is at-will, then the claimant has no property interest in the job."). Defendants did not have fair notice that firing Plaintiff Czyzewski from an explicitly at-will employment relationship for cause would be unlawful in view of the essential requirement that due process only applies to protected property interests. *See Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (explaining that a § 1983 claim must establish a constitutionally protected liberty or property interest).

Thus, the Court agrees with Defendants that Plaintiffs have failed to meet their burden to show that the particular right alleged here, due process prior to termination of an at-will employee, was clearly established by the law prior to Defendants' actions.

### 3.   First Amendment

Defendants argue that they are entitled to qualified immunity on Plaintiffs' First Amendment claims because there are no clearly established rights regarding either protected public employee speech or "in the context of the administration and provision of public housing." (Doc. 163 at 39–40.) Plaintiffs respond that qualified immunity is not appropriate, citing to two state court cases and a United States Supreme Court concurrence that Plaintiffs contend demonstrate a clearly established right to the freedom of association for public housing tenants. (Doc. 182 at 16–17.)

### i.   Employment Termination

Plaintiffs bring a First Amendment retaliation claim against Defendants, alleging that Plaintiff Czyzewski was terminated from his RA position in retaliation for protected speech that he and Plaintiff Bollfrass made prior to his termination. (Doc. 136, ¶¶ 43–68.)

Defendants argue that First Amendment retaliation claims made by government employees on adverse employment actions are so fact intensive that the law is not clearly established here, if ever. (Doc. 163 at 39) (citing *Lytle v. Wondrash*, 182 F.3d 1083, 1088 (1999)). Plaintiffs briefing fails to respond to this argument or discuss whether Plaintiff Czyzewski's termination was in violation of a clearly established constitutional right. (*See* Doc. 182.)

In *Lytle*, the Ninth Circuit stated:

> Because *Pickering*'s analysis as to whether a public employee's expression is constitutionally protected requires a fact-intensive, context-specific balancing of competing interests, the law regarding such claims will rarely, if ever, be sufficiently clearly established to preclude qualified immunity under *Harlow* and its progeny. Thus, we must decide whether the outcome of the *Pickering* balancing test so clearly favored Lytle that it would have been patently unreasonable for the Appellants to conclude that their actions were lawful.

182 F.3d at 1088 (citations and quotations omitted).

Because the burden is on Plaintiffs to show that the law was clearly established but Plaintiffs failed to carry that burden, and because, as discussed below in Part IV.C.1, *infra*, the Court finds that the *Pickering* balancing test favors Defendants, the Court grants summary judgment in Defendants' favor on the issue of qualified immunity to Plaintiffs' First Amendment retaliatory termination claim.

## ii.        Remaining First Amendment claims

Plaintiffs also bring First Amendment claims alleging that Defendants retaliated against Plaintiffs for engaging in protected speech and for participating in RC activism. (Doc. 136, ¶¶ 207–31.) Plaintiffs cite certain cases that they contend clearly establish rights (Doc. 182 at 16–17), while Defendants argue that those cases are inapposite. (Doc. 184 at 2–3.)

As discussed above, "[t]he 'clearly established' standard . . . requires that the legal principle clearly prohibit the [official's] conduct in the particular circumstances before

him. The rule's contours must be so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Wesby*, --- U.S. ---, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). And the Supreme Court has repeatedly cautioned against defining a clearly established law "at a high level of generality." *Id.* It is Plaintiffs' burden to prove that "the right allegedly violated was clearly established at the time of the alleged misconduct." *Romero*, 931 F.2d at 627.

Plaintiffs appear to assert two distinct rights. First, Plaintiffs assert the right to be free from retaliation for speech that includes complaints about the conditions of their living arrangements as tenants in public housing. Second, Plaintiffs assert their right to be free from retaliation for engaging in organized group efforts to petition the public housing department regarding the same. The Court examines Plaintiffs' cited cases to determine whether these rights were clearly established at the time they were allegedly violated.

Plaintiffs first point to Justice Douglas's concurrence in *Thorpe v. Hous. Auth. of City of Durham*, 386 U.S. 670 (1967). In *Thorpe*, the housing authority brought an ejectment proceeding against a tenant in federal housing after she refused to vacate the premises following a notice of termination. 386 U.S. at 671. The housing authority issued the tenant a 20-day notice of termination the day after she was elected as president of the housing's tenants' organization but refused to provide a reason for the lease termination. *Id.* The tenant argued that she was "constitutionally entitled to notice setting forth the reasons for termination of her lease" and a related hearing, and that her eviction would be improper because it was based on her participation in the tenants' organization. *Id.* at 672. The Supreme Court did not reach the tenant's arguments because, after her proceedings were initiated, HUD issued a directive requiring local housing authorities to provide tenants with a hearing and reasons for eviction prior to lease termination. *Id.* The Court vacated and remanded the case for further proceedings considering the eviction procedures established in HUD's directive. *Id.* at 673.

In his concurrence, Justice Douglas states "[t]he recipient of a government benefit, be it a tax exemption, unemployment compensation, public employment, a license to

practice law, or a home in a public housing project, cannot be made to forfeit the benefit because he exercises a constitutional right." *Id.* at 678–79 (citations omitted). Comparing the right to public housing to the right to a tax exemption, which the Supreme Court recognized in *Speiser v. Randall*, 357 U.S. 513 (1958), Justice Douglas states:

> [W]e recognized that "[t]o deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech. The appellees are plainly mistaken in their argument that, because a tax exemption is a 'privilege' or 'bounty,' its denial may not infringe speech." No more can a tenant in a public housing project be evicted for the exercise of her right of association, a right protected by the First and Fourteenth Amendments.

*Thorpe*, 386 U.S. at 679 (Douglas, J., concurring).

Justice Douglas's review of the case law suggests that a slightly broader right, that "the recipient of a government benefit . . . cannot be made to forfeit the benefit because he exercises a constitutional right" is clearly established. However, given the directive that the law must not be defined at a high level of generality, this Court will look to the additional state case law cited by Plaintiffs. "Given this absence of binding precedent, we may look to decisions from the other circuits to determine whether they reflect a consensus of courts that can be said to clearly establish the relevant law." *Shooter*, 4 F.4th at 963 (citations and quotations omitted).

Plaintiffs have identified two state court decisions, neither of which squarely address the merits of the claims here, but both of which are instructive. In *Lawson*, the Wisconsin Supreme Court addressed whether the state was allowed to adopt a resolution that prohibited anyone "who is a member of an organization designated as subversive by the Attorney General" from securing residence in federally funded public housing. *Lawson v. Hous. Auth. of City of Milwaukee*, 70 N.W.2d 605, 611 (Wis. 1955). The *Lawson* court held that "the possible harm which might result in suppressing the freedoms of the First [A]mendment outweigh any threatened evil posed by the occupation by members of

1  subversive organizations of units in federally aided housing projects." *Id.* at 615.

2      In *Carrera*, the Texas Supreme Court declined to find that a housing authority

3  supervisor and director were entitled to qualified immunity in an action by officers of a

4  tenants' association alleging that they were deprived of their First Amendment rights of

5  free speech, organization, and association. *Carrera v. Yepez*, 6 S.W.3d 654, 670 (Tex.

6  1999). In determining whether the asserted rights in the action were clearly established, the

7  *Carrera* court held that "[i]n our view, the issue is whether Appellants' conduct in

8  beginning eviction proceedings, and disenfranchising the tenants of their elected

9  representatives allegedly in retaliation for constitutionally protected activity was

10  objectively reasonable in light of clearly established law. We conclude that it was not." *Id.*

11  at 669. In so holding, the *Carrera* court noted that "[f]or more than thirty years, the rights

12  of tenants in public housing projects to the fundamental freedoms of speech and association

13  have been held sacrosanct." *Id.* (citing *Thorpe*, 386 U.S. at 679 and *Lawson*, 270 Wis. at

14  287–88).

15      Although none of these excerpts are binding, together these cases suggest that courts

16  have reached a consensus to protect a tenant's right to be free from First Amendment

17  retaliation in public housing. *Shooter*, 4 F.4th at 963. Accordingly, the Court finds that for

18  the purposes of this case, Plaintiffs' asserted rights to be free from retaliation for protected

19  speech and organized efforts as tenants in public housing have been clearly established.

20      Regarding the other prong of the test for qualified immunity, however, even viewing

21  the facts in the light most favorable to Plaintiffs, there are no disputed issues of material

22  fact where a reasonable juror could find that Defendants' conduct violated Plaintiffs' First

23  Amendment rights, as discussed at length in Parts IV.C and IV.D, *supra*. *See Saucier*, 533

24  U.S. at 200–01. Therefore, the Court finds that Defendants are entitled to qualified

25  immunity on Plaintiffs' First Amendment claims.

26      **B.**    **Procedural Due Process**

27      Even if Defendants are not entitled to qualified immunity on Plaintiffs' due process

28  claim, Defendants are still entitled to summary judgment on the merits as a matter of law.

Defendants argue that Plaintiffs have failed to raise a disputed issue of fact as to whether Plaintiff Czyzewski had a protected property interest in his employment, and whether his termination deprived him of that interest. (Doc. 163 at 20–21.)

### 1.   Legal Standard

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). A § 1983 claim based on procedural due process has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) a lack of process. *Portman*, 995 F.2d at 904.

### 2.   Protected Property Interest

Here, Plaintiffs assert that Plaintiff Czyzewski had a protected property interest in his employment as an RA at Fillmore Gardens. (Doc. 182 at 12.) Plaintiff Czyzewski was employed as an RA beginning on March 21, 2016, through the Scott Business Group ("Scott"), an organization with an employee handbook that Plaintiff contends altered his at-will employment relationship to one requiring "just cause" for termination. (*Id.*; *see also* Doc. 163-2 at 261.)

Defendants rebut this assertion with evidence that Plaintiff Czyzewski's employment contract and the Scott employee handbook indicate that his employment was explicitly at-will. (Doc. 163 at 21; Doc. 184 at 16–17; *see also* Doc. 163-2 at 265; Doc. 163-2 at 267–75.) Plaintiffs retort that the Scott employee handbook enumerates a list of reasons for "just cause termination" without prior warning. (Doc. 182 at 13.) In Plaintiffs' view, the Scott policy modified Plaintiff Czyzewski's at-will contract and created a legitimate expectation in his continued employment such that his employment constituted a protected property interest under the Fourteenth Amendment. (*Id.*) Plaintiffs cite to *Wagner v. Globe*, 722 P.2d 250, 253 (Ariz. 1986). (*Id.*) Defendants reply that *Wagner* is inapposite because the Scott employee handbook reaffirms at-will employment multiple times despite the section that Plaintiffs seek to introduce into the employment contract.

(Doc. 184 at 16–17.)

Under Arizona law, there is a general presumption that employment relationships for an indefinite term are considered at-will employment, under which an employment relationship can be terminated by either party for any reason at any time. *Wagner*, 722 P.2d at 252. Parties are free to contract for additional employment terms that modify the traditional at-will relationship, however, including terms that create a protected interest in employment through expected job security. *Leikvold v. Valley View Comty. Hosp.*, 688 P.2d 170, 173 (Ariz. 1984). These additional employment terms can become implied-in-fact contract terms, "based on the totality of [] statements and actions" of the parties and create an exception to at-will employment. *Wagner*, 722 P.2d at 254. So, "[w]hile employment contracts without express terms are presumptively at will, an employee can overcome this presumption by establishing a contract term that is either expressed or inferred from the words or conduct of the parties." *Demasse v. ITT Corp.*, 984 P.2d 1138, 1143 (Ariz. 1999). For example, if the circumstances of employment create an implied promise of job security and the employee relies on it, such implied terms become a part of the contract and "the employment relationship *is no longer at will*." *Id.* (emphasis in original).

One such way employment relationships can be modified is through the use of employee handbooks or manuals. *Wagner*, 722 P.2d at 254. All handbook terms, however, do not create contractual promises. "If the statement is merely a description of the employer's present policies … it is neither a promise nor a statement that could reasonably be relied on as a commitment." *Id.* (quotations omitted). Indeed, employers are free "to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason." *Leikvold*, 688 P.2d at 174. "Such action[] [in] issuing one with clear language of limitation, [would] instill no reasonable expectations of job security and do[es] not give employees any reason to rely on representations in the manual." *Id.*

While Arizona courts have recognized that "[w]hether any particular personnel manual modifies any particular employment-at-will relationship and becomes part of the particular employment contract is a question of fact," it is also true that "[w]here the terms of an agreement are clear and unambiguous, the construction of the contract is a question of law for the court." *Leikvold*, 688 P.2d at 174.

Here, the Court finds that there is no disputed issue of material fact as to whether Plaintiff Czyzewski's employment was at-will. Although Plaintiffs point to language in the handbook suggesting that Scott terminates employees for cause under certain circumstances, looking at the entire handbook in context removes any doubt about Plaintiff Czyzewski's status as an at-will employee. The section that Plaintiffs reference is an outline of Scott's Code of Professional Conduct that lists prohibited behavior:

> [Scott] expects all employees to comply with this Conduct Policy and conduct business in the utmost professional manner. Any employee not in compliance with this policy is no longer acting in the Company's best interest and may be subject to disciplinary action, including up to termination of employment.
>
> A. [Scott] expects that all employees exhibit appropriate and professional behavior at all times while on duty or on assignment.
> B. Behavior identified in the following list shall constitute cause for immediate termination without previous or further warning. This list is not intended to be conclusive and is subject to revision by [Scott] as necessary and without prior notice:
>
>   a. Fighting with or engaging in the assault or threatening harm to any other person while working
>   b. Insubordination, including refusal or intentional failure to perform assigned work; this includes deliberate failure to follow instructions or work per [Scott]'s policies and procedures
>   c. Stealing, damaging, hiding, removing, or unauthorized possession of [Scott's] or another person's personal property

> d.  Unauthorized use of, or destruction of, or serious negligence in custody, care, or use of [Scott's] equipment, supplies, or facilities whether or not such conduct results in damage to property or injury to other persons
> e.  Falsification of any [Scott] records, reports, or documents

(Doc. 163-2 at 271.) The policy indicates that any violation of the code of conduct may result in disciplinary action, but there are certain offenses that warrant immediate termination. The Code of Professional Conduct section upon which Plaintiffs rely immediately follows a section titled "At-Will Employment" that states:

> Employment at this Company is at-will. An at-will employment relationship can be terminated at any time, with or without reason or notice by either employer or the employee. This at-will employment relationship exists regardless of any statements by office personnel to the contrary.

(*Id.*) Additionally, there are other references to at-will employment in the handbook, including within the Acknowledgment of Receipt:

> I acknowledge that nothing in this manual is to be interpreted as a contract, expressed or implied, or an inducement for employment, nor does it guarantee my employment for any period.
>
> I understand and accept that my employment with the Company is at-will. I have the right to resign with or without cause, just as the Company may terminate my employment at any time with or without cause or notice, subject to applicable laws. I understand that nothing in the manual or any oral or written statement alters the at-will employment relationship, except by a written agreement signed by the employee and [Scott] Chief Operating Officer, Millie Gonzalez-Scott.

(*Id.* at 275.)

The section upon which Plaintiffs rely does not overcome the presumption of at-will employment or sufficiently establish the existence of an implied contract when viewed

in the context of the entire policy. "An implied-in-fact contract term is [only] formed when a reasonable person could conclude that both parties intended that the employer's (or the employee's) right to terminate the employment relationship at-will had been limited." *Demasse*, 984 P.2d at 1143 (quotations omitted). Here, no reasonable person could find that Scott intended to incorporate for-cause termination provisions to modify Plaintiff Czyzewski's at-will employment contract because the disclaimer in the employee handbook is conspicuous and unambiguous. (*See* Doc. 163-2 at 275.) Moreover, while the *Wagner* court notes that the presence of a conspicuous disclaimer in an employee handbook may not fully insulate an employer from liability in the presence of "contrary written or oral assurances" to the employee, Plaintiffs have failed to allege that Defendants made any other assurances regarding Plaintiff Czyzewski's continued employment that would preclude summary judgment on this issue. *Wagner* at 254, n. 5.

"If employment is at-will, then the claimant has no property interest in the job." *Haglin*, 42 Fed. Appx. at 57 (citing *Brady v. Gebbie*, 859 F.2d 1543, 1548 (9th Cir. 1988)); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.") (quotations omitted). Because Plaintiffs have failed to establish a disputed material fact as to whether Plaintiff Czyzewski had a protected property interest in his employment, the Court finds that he did not have a protected property interest in his employment as a matter of law. *See Leikvold*, 688 P.2d at 174. Thus, summary judgment is appropriate on Plaintiffs' due process claim based on his termination.[2]

C.     **First Amendment Retaliation**

Even if Defendants are not entitled to qualified immunity on Plaintiffs' First Amendment retaliation claims, Defendants are still entitled to summary judgment on the merits as a matter of law. Plaintiffs assert that Defendants retaliated against them for

---

[2] Although the parties address the additional prongs of the procedural due process test, because the Court finds that Plaintiff Czyzewski did not have a protected property interest in his at-will employment, the Court need not reach the remaining prongs of the test.

engaging in conduct protected by the First Amendment. Defendants seek summary judgment on Plaintiffs' First Amendment retaliation claims based on three events: (1) Defendant Emmerson's termination of Plaintiff Czyzewski's RA position; (2) Defendants' attempted eviction of Plaintiffs; and (3) Defendants' financial audit of Plaintiffs. (Doc. 163 at 22–32.) The Court addresses each in turn.

### 1.      Employment Termination

#### i.      Legal Standard

In the employment context, to state a claim against the government for a violation of an employee's First Amendment rights, the employee must establish (1) that he engaged in protected speech; (2) that the employer took an adverse employment action against him; and (3) that his speech was a substantial and motivating factor for the adverse employment action. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003); *see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1986). After the employee meets its burden on the first three steps of the inquiry, the burden shifts to the government to prove "by a preponderance of the evidence that it would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Clairmont*, 632 F.3d at 1102–03. Independent contractors employed under a government contract are subject to the same analysis as public employees. *Clairmont*, 632 F.3d at 1101 ("[W]hen a business vendor operates under a contract with a public agency, we analyze its First Amendment retaliation claim under the same basic approach that we would use if the claim had been raised by an employee of the agency.") (quoting *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004)).

Here, Defendants focus on the following arguments: (1) Defendant Emmerson did not have a retaliatory motive for firing Plaintiff Czyzewski because he was not aware of any protected speech; and (2) Defendant Emmerson would have terminated Plaintiff Czyzewski even in the absence of his protected speech.[3] (Doc. 163 at 23–26.) Plaintiffs'

---

[3] Defendants' brief appears to concede that Plaintiff Czyzewski engaged in protected speech and that he was subject to an adverse employment action because these arguments

Response fails to provide responsive arguments to Defendants' arguments on Plaintiff Czyzewski's termination. (*See* Doc. 182 at 14.) Although Plaintiffs' brief includes a section heading titled "Frank's termination violated the First Amendment," Plaintiffs failed to include any arguments under that section.[4] Plaintiffs do reference their First Amendment retaliation claim in the context of their *Monell* claims, so the Court will refer to those arguments to the extent they are responsive. (*See* Doc. 182 at 18–20.)

### ii. Substantial and Motivating Factor

Plaintiffs must first establish that the person who made the decision to fire Plaintiff Czyzewski had knowledge of his protected speech. *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002). "In addition to knowledge, a plaintiff must (i) establish proximity in time between [his] expressive conduct and allegedly retaliatory actions; (ii) produce evidence that the defendants expressed opposition to [his] speech, either to [him] or to others; or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual." *Capo v. Port Angeles Sch. Dist. No. 121 et al.*, No. C07-5685BHS, 2009 WL 413498, at *6 (W.D. Wash. Feb. 18, 2009) (citing *Alpha Energy Savers, Inc.*, 381 F.3d at 929). The substantial and motivating factor element "may be met with either direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002). Where there are no disputed issues of fact for the jury to decide, however, summary judgment may be appropriate. *Coszalter*, 320 F.3d at 978 ("[T]he totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive.").

Defendants argue that Defendant Emmerson, PHD Deputy Housing Director, did not have any knowledge of Plaintiff Czyzewski's protected speech prior to terminating him. (Doc. 163 at 24–25.) Defendants also argue that Plaintiffs have failed to raise a

are not included in its Motion.

[4] Moreover, while Plaintiff's own Partial Motion for Summary Judgment addresses its First Amendment retaliation claim, the two pages that Plaintiffs dedicate to their claim does not specifically address whether the relevant test for First Amendment retaliation against public employees has been met. (*See* Doc. 165 at 19–20).

1   disputed issue of fact as to whether Defendant Emmerson had a retaliatory motive in firing

2   Plaintiff Czyzewski based on his protected speech. (*Id.*)

3       Upon review of Plaintiffs' TAC, Plaintiffs' Response, and the record, the Court

4   agrees that Plaintiffs have failed to present any disputed facts as to whether Defendant

5   Emmerson was aware of any protected speech by Plaintiff Czyzewski prior to his

6   termination.

7       Plaintiffs' TAC sets forth the facts surrounding Plaintiff Czyzewski's termination

8   in paragraphs 43 through 68. Plaintiffs assert that Defendant Emmerson fired Plaintiff on

9   July 18, 2017,[5] for being "unprofessional." (Doc. 136, ¶¶ 57, 67.) Prior to that date, the

10  only evidence of Plaintiff Czyzewski engaging in protected speech occurred on July 12,

11  2017, when Plaintiff Czyzewski, in his capacity as RA, emailed Jerianne Mackenzie and

12  Dina Fernandez about an incident where Plaintiff Czyzewski called 911 because another

13  resident was incapacitated in his own apartment. (Doc. 136, ¶ 50) (citing Doc. 14 at 39). In

14  that email, Plaintiff Czyzewski stated:

15          The apartment was hot and humid. The temperature was 84
16          degrees. The threshold between the kitchen flooring and the
            carpet in the living room was wet. Could it be that Clint's air-
17          conditioning needs servicing? I know that Clint is mentally
            challenged and want to know if we can do something to prevent
18          a possible personal health issue of our residences [sic] as it
            relates to our maintenance plan that is more focused on the
19          wellbeing of the residents instead of the money?
20

21  (Doc. 14 at 39.) The TAC does not indicate whether Plaintiff Czyzewski received a

22  response to this email, or whether either of the parties that received the email disclosed the

23  substance of that email to anyone else, including Defendant Emmerson. Because Plaintiffs

24  have failed to establish any inference that Defendant Emmerson had knowledge of this

25  communication prior to Plaintiff Czyzewski's termination, Plaintiffs cannot rely on this

26  communication to establish First Amendment Retaliation for Plaintiff Czyzewski's

27  ──────────────

28  [5] Although the TAC states that Plaintiff Czyzewski was fired on July 18, 2019, the chronology of Plaintiffs' allegations and the evidence relied on suggest that the actual date of Plaintiff Czyzewski's termination was on July 18, 2017. (*See* Doc. 163-2 at 277–81.)

termination. *Allen*, 283 F.3d at 1076.

Plaintiffs' Response attempts to establish Defendant Emmerson's knowledge of protected speech and a timeline of retaliation by referencing a July 21, 2017, letter from Defendant Emmerson to Plaintiff Bollfrass in which Defendant Emmerson admonishes Plaintiff Bollfrass, as President of the RC, for engaging in harassing behavior of PHD staff and other tenants. (Doc. 182 at 19–20.) Defendant Emmerson's letter post-dates Plaintiff Czyzewski's termination by three days but references two specific communications between Plaintiff Bollfrass and PHD staff that occurred on July 14 and 15, 2017 regarding conditions at Fillmore Gardens. (*See* Doc. 14 at 46.) According to Plaintiffs, "[t]he timeline of these acts is nothing short of conclusive evidence" that Defendant Emmerson retaliated against Plaintiff Czyzewski "for actions taken while assisting the [RC]." (Doc. 182 at 20.) Plaintiffs' response also points to Defendant Grittman's deposition where she states that in 2017, she had conversations with Defendant Emmerson about how to deal with Plaintiffs' "constant harassment." (Doc. 182 at 18) (citing 182-1 at 233–34.)

The Court finds that Plaintiffs have failed to raise a disputed issue of material fact as to whether Defendant Emmerson fired Plaintiff Czyzewski for his protected speech. Instead, the record only establishes that in the months leading up to Plaintiff Czyzewski's termination, Plaintiff Bollfrass sent several complaints to PHD staff and that three days after Plaintiff Czyzewski was terminated, Defendant Emmerson had knowledge of Plaintiff Bollfrass's communications. Plaintiffs do not cite to any authority to support their position that the speech of a government employee's spouse can serve as the employee's own speech for the purposes of a First Amendment retaliation claim. Moreover, Plaintiffs fail to argue that any of the other Defendants' knowledge of Plaintiff Czyzewski's protected speech can be fairly imputed onto Defendant Emmerson. Plaintiffs also cannot rely on Defendant Grittman's admission regarding speaking with Defendant Emmerson about Plaintiffs' allegedly harassing behavior in 2017 because Plaintiffs do not present any evidence that those conversations took place prior to Plaintiff Czyzewski's termination.

Even if the Court were inclined to credit Plaintiffs the tenuous inferences that timing

establishes a link between the events, the timing alone here is not sufficient to withstand summary judgment in view of the totality of the circumstances suggesting that Defendant Emmerson had no knowledge of Plaintiff Czyzewski's protected speech. *See Coszalter*, 320 F.3d at 978*; see also Capo*, 2009 WL 413498, at *8 (granting summary judgment against a plaintiff for failure to establish a reasonable inference that retaliation was a substantial and motivating factor for the adverse action where the only evidence was circumstantial evidence of proximity in time).

### iii.    But-For Causation

Defendants argue that regardless of whether Plaintiff Czyzewski engaged in protected speech and Defendant Emmerson was aware of it, Defendants can establish that Defendant Emmerson would have fired Plaintiff Czyzewski anyway due to his altercation with maintenance worker Robert Olvera. (Doc 163 at 26.) Defendants contend that because Defendant Emmerson had legitimate grounds to terminate Plaintiff Czyzewski, Plaintiffs cannot show a but-for causation between any protected speech and Plaintiff Czyzewski's termination. (*Id.*)

After the employee meets its burden on the first three steps of the inquiry, the burden shifts to the government to prove "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287.

Plaintiff Czyzewski's duties as an RA included "dealing with the maintenance person Robert [Olvera] who handled work orders," but Mr. Olvera allegedly did not like either of the Plaintiffs. (Doc. 136, ¶¶ 47–48.) On July 18, 2017, Plaintiff Czyzewski was directed by PHD staff to retrieve a key from Mr. Olvera on behalf of the RC. (*Id.*, ¶¶ 57–59.) When Plaintiff attempted to get the key, however, they got into an altercation that ended with a door being slammed. (*Id.*, ¶ 60); (Doc. 163-2 at 280.) The parties dispute who started the altercation and who slammed the door on who, but Mr. Olvera informed PHD staff that Plaintiff Czyzewski slammed the door in his face. (*Compare* Doc. 136, ¶ 60 *with* Doc. 163-2 at 280.) In response, PHD staff called the City of Phoenix Police. (Doc. 136,

¶ 62.) After interviewing the involved parties, the police determined that no crime had been committed and did not make any arrests. (Doc. 163-2 at 277–81.) The police report contains the following summary of the incident:

> On 07/18/2017 at 720 hrs Robert Olvera stated that he had a [confrontation] with Frank Czyzewski over keys. Robert stated that Frank came to the maintenance building demanding that he make him a key. Robert stated that he told Frank that he would have to get ahold of Jerianne.
> Robert stated that as he started to shut the door, Frank pushed it back open into him. Frank again demanded that he get a key and held up his phone saying that he had a message from Jerianne. Robert stated that he doesn't take orders from Frank and this isn't the first time that he has tried to use his position to get things.
> I then spoke to Dina who is the housing manager. Dina stated that this week Frank isn't in charge at his position and another resident is. Dina stated that Frank continually gets involved and tries to take control of the housing unit.

(Doc. 14 at 52.) The police told Plaintiff Czyzewski not to speak to Mr. Olvera anymore and left. (Doc. 136, ¶ 65.) At some time later, Defendant Fernandez approached Plaintiff Czyzewski at home and told him to come to her office, where Defendants Grittman and Emmerson were waiting. (Doc. 136, ¶ 66.) The parties dispute the length and context of the meeting, but it is undisputed that Defendant Emmerson fired Plaintiff Czyzewski from his RA position for being allegedly "unprofessional." (*Id.*, ¶ 67.)

Plaintiffs argue, albeit in relation to their *Monell* claims, that Defendant Fernandez's statements to City of Phoenix police that he "continually gets involved and tries to take control of the housing unit" contradict Defendants' attempts to establish that Plaintiff was terminated for the altercation and instead show that the cause of his termination was pretextual. (Doc. 182 at 19.)

However, the totality of the evidence suggests that Plaintiff Czyzewski was fired from his RA position because of his altercation with Mr. Olvera. *See Coszalter*, 320 F.3d at 978. Even viewing the disputed facts in the light most favorable to Plaintiffs, the record

shows that Plaintiff Czyzewski was fired immediately after Mr. Olvera reported that he acted in an abusive and threatening manner towards him. Although Plaintiffs dispute who slammed the door in that altercation, even if Plaintiff Czyzewski was the victim, Defendant Emmerson chose to believe Mr. Olvera and fired him based on Mr. Olvera's account. And, although Plaintiff argues that Defendant Fernandez's statements to police that "Frank continually gets involved and tries to take control of the housing unit" suggest that the altercation was pretextual, the Court finds Defendant Fernandez's statement merely constitutes additional evidence that Plaintiff Czyzewski was fired for not properly doing his job as an RA. Plaintiffs do not adequately explain how his alleged attempts to "take over the housing unit" constitute protected speech or establish a disputed fact that his termination was based on anything other than his "unprofessional" behavior, as Defendant Emmerson stated. Under the facts in the record, Plaintiffs are not entitled to any inference that the altercation was a pretext for firing Plaintiff based on any protected speech that he made. *Liberty Lobby, Inc.*, 477 U.S. at 252 (finding the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" in the absence of "evidence on which the jury could reasonably find for the plaintiff").

Therefore, the Court grants summary judgment on Plaintiff's First Amendment retaliation claim related to his termination from his RA position.

### 2.    30-Day Eviction Notice

#### i.    Legal Standard

The First Amendment "forbids government officials from retaliating against individuals for speaking out" against the Government. *Blair v. Bethel Sch. Dis.*, 608 F.3d 540, 543 (9th Cir. 2010). To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subject to adverse action that would chill a person of ordinary firmness from continuing to engage in the activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Id.* (citations and quotations omitted). After a plaintiff makes these showings, the burden is shifted to the defendants to

prove "by a preponderance of the evidence that [they] would have reached the same decision … even in the absence of [the plaintiff's] protected conduct." *Mt. Healthy*, 429 U.S. at 287.

Defendants appear to concede that Plaintiffs' engaged in a constitutionally protected activity, that the attempted eviction constitutes an adverse action, and Defendants had knowledge of Plaintiffs' protected activity. Defendants argue that Plaintiffs cannot establish that retaliation was a substantial and motivating factor behind the attempted eviction, and retaliation was not the but-for cause of the attempted eviction in view of Plaintiff Czyzewski's altercation with Ms. Magaard. (Doc. 163 at 29–32.)

### ii.     Substantial and Motivating Factor

Defendants argue that Plaintiffs have failed to offer any direct or circumstantial evidence that the eviction notice was motivated by retaliation. (Doc. 163 at 29.) Specifically, Defendants contend that Plaintiffs' circumstantial evidence of timing alone is not enough to raise a triable issue when looking at the "totality of the facts." (*Id.*) Defendants argue that Plaintiffs have failed to put forth evidence of Defendants' opposition to Plaintiffs' protected speech or any evidence that the reason for Plaintiffs' attempted eviction was pretextual. (*Id.* at 30.)

Plaintiffs first respond that the Court previously rejected Defendants same arguments at the motion to dismiss stage. (Doc. 182 at 7.) Plaintiffs point to passages of this Court's Order on Defendants' Motion to Dismiss to support its position that the Court has already decided that Plaintiffs' have "objective evidence of retaliation" based on Defendant Fernandez's alleged statement to police officers that an arrest guarantees an eviction. (*See* Doc. 182 at 7–9.) The Court disagrees with this characterization of its Order.

As Defendants note, the standards are different for motions to dismiss and motions for summary judgment. At the motion to dismiss stage, the Court evaluated the sufficiency of Plaintiffs' allegations to assess whether Plaintiffs stated enough facts in their complaint that, *if true*, present a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, on summary judgment, the Court evaluates whether Defendants, as the moving party,

have met their burden to show that there are no material disputed facts left for trial and that, in viewing the evidence in the light most favorable to the nonmoving party, summary judgment is warranted as a matter of law. Fed. R. Civ. P. 56(a); *see also Adickes*, 398 U.S. at 157. At this stage, the Court has been presented with evidence from both parties and does not rely solely on the assertions in Plaintiffs' TAC. Moreover, the cited passages from this Court's prior Order discuss the evidence in the context of retaliatory arrests under *Lozman v. City of Rivera Beach*, --- U.S. ---, 138 S. Ct. 1945, 1947–48 (2018), and state law retaliation under A.R.S. § 33-1381(A), not under the standard for First Amendment retaliation. (*See* Doc. 90 at 7–9.) Therefore, the Court reevaluates the parties' arguments and evidence under the summary judgment standard, irrespective of what the Court determined at the motion to dismiss stage.

Plaintiffs point to several pieces of evidence that they allege support a finding of retaliatory motive for the eviction notice. First, are made by Defendant Fernandez to police officers during an interview regarding an altercation at the PHD manager's meeting on July 21, 2018 between Plaintiff Czyzewski and Ms. Magaard that ultimately led to Plaintiff Czyzewski's arrest.[6] (Doc. 182 at 8; *see* Doc. 182-1.) According to Plaintiffs' interpretation of the transcript:

> Defendant Dina Fernandez was "actually typing up a 'thirty day' … eviction notice" when she told the arresting officers that the Defendants "no longer want to recognize this [RC]" and that going "through HUD" is "not an immediate change." While she is literally typing up the eviction notice, Dina Fernandez tells Defendant Julie Bosshart "that's my justification" in reference to the incident between Frank and Donna Magaard. Defendant Fernandez then further states: "You know the emails everybody gets, they're just bullies." Julie Bosshart agreed stating "they are bullies."

(Doc. 182 at 8) (citations omitted). Plaintiffs also refer to a statement Defendant Hogan made during a March 6, 2019, meeting where Defendant Hogan, in reference to a pending

---

[6] The parties dispute who started the altercation.

financial audit into the RC's alleged misuse of funds, that "you bet your bottom dollar you'll be held accountable for whatever you all do here." (Doc. 182 at 8) (citing Doc. 32-1, ¶ 12). Finally, Plaintiffs rely on the timing between Plaintiffs' complaints about the non-smoking policy and Plaintiffs' RC activism, coupled with the independent panel's decision to vacate the eviction, as circumstantial evidence of a retaliatory motive for the eviction. (Doc. 182 at 9–10.)

In reply, Defendants maintain that Plaintiffs' citations to the record are misleading and attempt to create a disputed issue of fact where there is none. (Doc. 184 at 14–15.) For example, although Plaintiffs recite the above statements by Defendant Fernandez, Defendants argue that Plaintiffs put those statements out of context of the entire 104-page transcript and fail to cite to specific portions of the transcript to obfuscate the evidence. (Doc. 184 at 15.)

To establish that a plaintiff's protected activity was a substantial and motivating factor for an adverse action taken against them, a plaintiff must establish knowledge by the decision maker and one of the following: (i) establish proximity in time between [his] expressive conduct and allegedly retaliatory actions; (ii) produce evidence that the defendants expressed opposition to [his] speech, either to [him] or to others; or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual." *Capo*, 2009 WL 413498, at *6 (citing *Alpha Energy Savers, Inc.,* 381 F.3d at 929). The substantial and motivating factor "may be met with either direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial." *Ulrich*, 308 F.3d at 979. In *Coszalter*, however, the Ninth Circuit held that "[t]he totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive." 320 F.3d at 978.

Here, knowledge is not in dispute, so the Court will evaluate whether there is other evidence to support a retaliatory motive for the eviction.[7]

---

[7] Although the parties are not clear on what Plaintiffs' protected speech was, the parties appear to agree that at least Plaintiffs' letters to HUD and PHD regarding the enforcement

1

### a.    Police Officer Body Camera Footage

The Court has reviewed the transcript of the police officer's body camera footage from June 21, 2018, and other relevant evidence in the record and finds that Plaintiffs' inaccurately present the facts surrounding the eviction notice and arrest. The Court, after evaluating the totality of the facts, further finds that Plaintiffs fail to raise a disputed issue of fact for trial. *See Coszalter*, 320 F.3d at 978.

The body camera transcript illustrates a different picture than the one presented by Plaintiffs. In talking with the police officers, Defendant Fernandez stated she was typing up the eviction notice after relaying her eyewitness account to the officers and mentioning that Plaintiff Czyzewski had a past altercation with PHD maintenance staff. (Doc. 182-1 at 151:721–152:773.) There is no discussion of Plaintiffs' involvement in the RC or Plaintiffs' prior complaints to PHD or HUD regarding the non-smoking policy during this portion of the transcript.

Then, the police officers ask for identifying information about Plaintiff Czyzewski and Ms. Magaard and explain PHD's rights to press charges based on Plaintiff Czyzewski's conduct at the manager's meeting. (Doc. 182-1 at 152:779–158:1040.) During that portion of the conversation, Defendant Fernandez states that she is texting with the housing manager, Defendant Grittman, to see whether she wants to press charges because Defendant Fernandez is not sure what to do. (Doc. 182-1 at 158:1038–40.) The officers then ask clarifying questions about Ms. Magaard's decision to call the police:

> Q1 [Officer]: Okay that's what we were wondering who - [Ms. Magaard] was sayin' that officers always come. We didn't know if it was [] community guys or?
>
> A2 [Defendant Fernandez]: Yeah that's (Walking Beat).
>
> Q1: That's (Walking Beat).
>
> A2: Yeah. So when she told me - 'cause I- I- we were just talking and I told her I feel so bad that I got wrapped up here

of the nonsmoking policy in 2017 and 2018 constitute protected speech, to the extent that those communications were not harassing or threatening towards PHD staff.

in tryin' to figure out what we were gonna do with him. So I knew I had to talk to [Ms. Magaard]. And so when I called her, she says well I called (unintelligible). I'm, like, oh okay. Um, and I never even though of doing that. I didn't - wasn't thinking clearly I guess.

…

A1 [Defendant Bosshart]: It was just one of those things where it all happened so quickly. The Fair Housing person was there. It was just chaos…

A2: [Y]eah. That's my justification (unintelligible).

…

A2: … I didn't even think about it at all actually. Um, and normally, I call when something like this happens - I call (Walking Beat) and say this is what happened, what do you suggest? But I didn't have time to - she beat me to [it].

(Doc. 182-1 at 159:1105–160:1154.) It is clear from this record that Defendant Fernandez was not saying "that's my justification" in reference to why she was writing the eviction notice. Instead, Defendant Fernandez is discussing why she did not call the police herself. Plaintiffs attempt to use this statement as evidence of pretext for the eviction, but the Court does not find a disputed issue of fact in view of the transcript itself.

Moreover, the statements about the RC appear to be similarly innocuous and in response to the officers' questioning related to whether PHD should press charges:

Q [Officer]: Has he been an issue for you guys?

A1 [Defendant Bosshart]: Yeah.

A2 [Defendant Fernandez]: Him and his boyfriend. A, like, … one of those just annoying pains that just don't go away and it's being disruptive - it's toxic actually.

Q1: Things you gotta think about is - is he- are you guys able to remove him from this position. That way he's not in the meetings anymore and, like…

A2: It's not an immediate change as (Julie) said because it is through HUD and it's a city.

Q1: Okay.

A2: So we have to go through some channels and we have to send a letter to HUD and tell 'em that…

Q1: Okay.

A2: …we don't - we no longer wanna recognize this, ah, tenant council blah, blah, blah. And then go through that channel…

…

A1: I mean, he did raise his fists.

A2: She's feelin' awful. She knows him too well. And the (unintelligible) is the eviction. You should…

…

A2: I'm tryin' to say you know the emails everybody gets and they're just harass- they're - they're just bullies.

A1: They- they are bullies.

A2: But I don't know about him being arrested.

Q: Well, I mean, we can't tell you obviously what to do. But if this is a continuing issue and if what Donna said is true that she feels threatened…

A2: So we're not exaggerating that we heard that when it was goin' on. He put up his fists and he was chasing her. We had to stop him. Then he came back at me.

(Doc. 182-1 at 163:1285–164:1331.)

These statements about the RC are not an explicit statement that PHD "no longer wants to recognize the [RC]," as Plaintiffs suggest. It is clear from the context of the conversation that Defendant Fernandez is explaining the process for removing Plaintiff Czyzewski from the RC in response to the officer's question about whether that would help alleviate the need to press charges against him. Although she refers to Plaintiffs as "toxic" and "bullies," Defendant Fernandez is not stating that she wishes to dissolve the RC or that she opposes any of Plaintiffs protected speech. Even Defendant Fernandez's reference to

the "emails everyone gets" would not lead a reasonable fact finder to conclude that she is referring to Plaintiffs' letters regarding enforcement of the non-smoking policy.[8]

Throughout the conversation, Defendant Fernandez is texting with Defendant Grittman and ruminating aloud with Defendant Bosshart about whether to press charges and seek Plaintiff Czyzewski's arrest. (*See* Doc. 182-1 at 160:1151, 1163–64, 161:1192–93.) Directly following the above dialogue, the conversation turns to whether Plaintiff's conduct warrants a 5-day eviction notice, instead of the 30-day notice that Defendant Fernandez already started to draft:

> A1 [Defendant Bosshart]: Well and - so if you arrest him, I'm assuming he'll get bailed out and he'll be able to return. Part of my concern is…
>
> Q1 [Officer]: Yeah he potentially could be back tomorrow morning.
> …
> A1: Is that 5-day then? Is that becoming five days?
>
> A2 [Defendant Fernandez]: If it is, I'm going for it.
>
> A1: Okay. 'Cause part of it is the aftermath because there's 120 residents that also live here.
> …
> A2: The to- the- the venom that's going to be placed once I get it - that he is arrested, I'm already on their hit list anyway, so it's not like it's a big deal but…
> …
> Q: But what are the [] repercussions if he's left today?
> …
> A1: And part of my concern is also for Donna as well. Is if nothing's done because he's obviously gonna blame her.
>
> A2: And he's already doing that.
> …
> A2: So we'll wait for this and if she says yes because this is a 5-day - if he's arrested then I'm gonna go ahead and go for it.

---

[8] This is especially true in view of the email evidence proffered by Defendants and the Letter of Concern issued to Plaintiff Bollfrass for his email harassment of PHD staff, as discussed in Part IV.C.2.ii.c, *infra*.

1

2              Q: So 5-day - 5-day eviction?

3              A2: we call it a 5-day … in the private sector. Five-day means
             you're literally out of there in five days.

4

5 (Doc. 182-1 at 164:1333–167:1441.) Then, in the middle of explaining another situation

6 where PHD attempted to evict a resident in five days, Defendant Fernandez states "[s]he

7 said if he didn't make harm to I- it be a hard sell with (Janice) which is our attorney. We

8 can try. The worst that can happen is she turns it into a 30. We're already issuing him a 30-

9 day." (*Id.* 167:1472–1475.) Defendant Fernandez then continues to ask the officers whether

10 they would press charges in her situation. (*Id.* 168:1505.) After another short discussion

11 about Plaintiff Czyzewski's potential future conduct based on his altercation at the

12 manager's meeting, Defendant Fernandez tells the officers to make the arrest. (*Id.*

13 168:1507–169:1541.)

14        Although Plaintiffs point to this portion of the conversation as evidence that

15 Plaintiffs' arrest and eviction were pretextual, the Court finds no disputed issue of fact in

16 view of the entire discussion. The dialogue between the parties clearly evidences Defendant

17 Fernandez's hesitation about arresting Plaintiff Czyzewski, and she only agrees to the arrest

18 after a lengthy discussion about the safety of other residents. Nothing in this conversation

19 can be reasonably construed as an attempt to evict Plaintiffs for protected speech, an

20 opposition to Plaintiffs' protected speech, or a pretextual reason to evict Plaintiffs. This is

21 especially true in view of Arizona Fair Housing Center representative Shawna Tarboro's

22 witness statement about what she witnessed during the June 18, 2017, manager's meeting.

23 (Doc. 182 at 92) ("Based on what I experienced, I recommend Mr. Czyzewski be issued a

24 City of Phoenix health and safety violation that would terminate his residency."); (*see also*

25 Doc. 163-2 at 57:5–72:23) (Ms. Tarboro's deposition testimony reaffirming the accuracy

26 of her witness statement).

27             **b.**      **Defendant Hogan's Statement**

28        Plaintiffs also seek to rely on Defendant Hogan's March 6, 2019, statement that

"you bet your bottom dollar you'll be held accountable for whatever you all do here." (Doc. 182 at 8) (citing Doc. 32-1 ¶ 12). The record shows that Defendant Hogan made this statement during her meeting with Plaintiffs following their failure to pay rent seven months *after* the PHD Grievance Panel's decision to set aside the eviction notice. Plaintiffs attempts to lump this conversation in with their arguments that Defendants retaliated against Plaintiffs by seeking to evict them is unavailing.

### c.   Remaining Evidence

Finally, Plaintiffs rely on the timing between Plaintiffs' complaints about the non-smoking policy and Plaintiffs' RC activism as circumstantial evidence of a retaliatory motive for the eviction. (Doc. 182 at 9–10.) In response, Defendants present evidence that their responses to Plaintiffs' complaints about the non-smoking policy and other resident lease violations were positive and encouraging, (*see* Doc. 163-2 at 9–11, 420–22, 426–48), unless Plaintiffs' complaints were abusive or harassing in nature (*see* Doc. 14 at 44, 46.)[9] For example, in response to Plaintiffs' letter to HUD on the non-smoking policy, Plaintiff received two letters that thanked Plaintiff Bollfrass for his involvement with the RC and his efforts to help Fillmore Gardens become smoke-free. (Doc. 14 at 58, 62.) Additionally in response to Plaintiffs' emails about resident lease violations that did not include insults about PHD staff, they always responded with "thank you for reporting this information," and an outline of PHD's next steps. (*See* Doc. 163-2 at 9–11, 420–22, 426–48.)

To show that retaliation was a substantial and motivating factor behind Defendants'

---

[9] Although Plaintiffs rely on the July 21, 2017 Letter of Concern to prove that Defendants opposed their protected speech, the "opposition" that Plaintiffs cite to is in reference to self-serving, and frankly condescending statements made within Plaintiffs' complaints. (*See* Doc. 14 at 46) ("In the past few months, you have been sending daily emails and text messages or phone calls to HD staff consisting of aggressive and abusive demands and accusations that are generally unrelated to the purposes of the Resident Council."). For example, Plaintiff's June 14 and 15, 2017 emails to PHD staff regarding conditions at Fillmore Gardens include statements such as "[t]he present smoking area is a perfect example of what management does when they do not care about those who are using it" and "I am angry and disgusted at the actions of management…was this done intentionally or was it just another stupid action by management?!," which PHD reasonably interpreted as harassing. (*See* Doc. 14 at 46.) The Court finds that PHD's July 21, 2017 Letter of Concern admonishing Plaintiff Bollfrass for his insults and harsh tone does not suggest opposition to Plaintiffs' First Amendment right to air its grievances where those grievances contained harassing speech, as a matter of law. *See Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 736 (1970).

allegedly retaliatory actions, Plaintiffs "can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory [conduct], from which a jury logically could infer that the plaintiff was [retaliated against] for his speech." *Coszalter*, 320 F.3d at 977 (quotations and citations omitted). The *Coszalter* court addressed the significance of time proximity evidence at the summary judgment stage:

> There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation. Whether an adverse [] action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment.

*Id.* at 978. In *Coszalter*, the Ninth Circuit reversed the lower court because in addition to proximity evidence, the plaintiffs also provided additional evidence that the defendants' explanation for its adverse employment actions were pretextual. *Id.*

The Court notes that Plaintiffs have failed to put forth affirmative evidence that Defendants expressed opposition to Plaintiffs' protected speech and RC involvement, or that their decision to issue the eviction notice was based on pretext. The eviction notice, however, was served on Plaintiffs on June 25, 2018, less than a year after Plaintiffs' repeated communications with PHD and HUD regarding enforcement of the non-smoking policy and Plaintiffs' engagement in the RC. Additionally, Defendants do not dispute their knowledge of those protected activities. Accordingly, because of temporal proximity, the substantial and motivating factor tips slightly in favor of Plaintiffs such that the Court will consider whether Defendants properly meet their burden to establish that the protected conduct was not the but-for cause of the eviction, as a matter of law. *See Mt. Healthy*, 429 U.S. at 287; *see also Coszalter*, 320 F.3d at 978 ("An eleven month gap in time is within the range that has been found to support an inference that [a] decision was retaliatory.").

### iii.      But For Causation

At the outset, the parties dispute whether the standard for "but-for causation" outlined in *Nieves* applies to Plaintiff's First Amendment retaliation claim for eviction. In *Nieves*, in the context of a claim for retaliatory arrest, the Supreme Court placed the burden on the plaintiff to establish that a retaliatory motive was the but-for cause of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, --- U.S. ---, 139 S. Ct. 1715, 1722 (2019). Plaintiff argues that the standard applicable here is more relaxed, while Defendant maintains that the *Nieves* case supplies the correct standard. (Doc. 182 at 10; Doc. 184 at 15-16.) According to Plaintiffs, the *Mt. Healthy* and *Pickering* cases properly place the burden on the government to establish that its decision would have been the same even in the absence of the protected speech. (Doc. 182 at 10.) The Court notes that *Mt. Healthy* and *Pickering* are both employer retaliation cases, and the Ninth Circuit recently applied the *Nieves* standard outlined above to a First Amendment retaliation claim based on governmental action against a non-employee. *See Sampson v. County of Los Angeles*, 974 F.3d 1012, 1019 (9th Cir. 2020) ("To prevail, [the plaintiff] must establish that Defendants' retaliatory animus was the but-for cause of her injury....") (quotations omitted).

The Court finds that regardless of which party has the burden to establish causation, Defendants have affirmatively put forth evidence that the eviction notice would have issued regardless of Plaintiffs' protected speech. The Court is not persuaded by Plaintiffs' attempts to mislead the Court with a misrepresentation of the relevant evidence, as discussed above.

Based on the in-depth review of the police officer's body camera footage transcript discussed above, Defendants have met their burden to establish that the eviction notice would have been issued regardless of Plaintiffs' protected speech due to Plaintiff Czyzewski's altercation with Ms. Magaard. (Doc. 182-1 at 86–88.) As noted in the transcript, Defendants Fernandez and Bosshart were apprehensive about Plaintiff Czyzewski's past and present anger issues and their ability to keep other residents safe if

he remained in the complex. Also apparent from the transcript is Defendants Fernandez and Bosshart's hesitation to have Plaintiff Czyzewski arrested for his conduct and the absence of any discussion about opposition to Plaintiffs' protected speech.

Plaintiffs point to the fact that the PHD Grievance Panel issued a decision setting aside the eviction notice as evidence that the eviction was retaliatory. The hearing decision, however, states only that "[t]he Panel found that both Ms. Magaard and Mr. Czyzewski were at fault and that Ms. Magaard initiated the alteration. The Termination of Lease for Material Non-compliance is hereby set aside." (Doc. 163-4 at 24–25.) The decision does not find any facts suggesting Defendants issued the notice in a manner supporting an inference of pretext or that it was based on anything other than this altercation. The fact that the eviction notice was overturned, by itself, would not lead a reasonable fact finder to conclude that Defendants' motivation for the eviction notice was based on something other than the altercation itself in the absence of other affirmative evidence. *Coszalter*, 320 F.3d at 978. The panel simply states that in light of Plaintiffs' live witness testimony that was only refuted by "hearsay," the panel could not uphold the eviction when multiple witnesses testified that Ms. Magaard instigated the altercation. (*See* Doc. 163-4 at 24–25.)

For the foregoing reasons, the Court grants summary judgment in favor of Defendants on Plaintiffs' First Amendment retaliation claim based on the June 25, 2018, eviction notice.

### 3.    PHD Housing Audit

At the outset, the Court notes that Plaintiffs' Response fails to respond to many of Defendants' arguments regarding Plaintiffs' First Amendment retaliation claim based on the PHD Housing Audit.[10] (*See* Doc. 182.) If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a material factual dispute, and that the dispute is genuine, "i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dudley v.*

---

[10] While Plaintiffs do discuss the housing audit in the context of their *Monell* claims, the Court does not find those arguments responsive to the specific test for First Amendment retaliation and Defendants related arguments, except as noted below. (*See* Doc. 182 at 5–6).

*Robbinson*, CV 08-1315-PHX-SMM (LOA), U.S. Dist. LEXIS 133569, at *3 (D. Ariz. Oct. 20, 2009); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, the Court will only address Defendants' arguments briefly in the absence of rebuttal from Plaintiffs. *See Tapestry on Cent. Condo. Ass'n v. Liberty Ins.*, No. CV-19-01490-PHX-MTL, 2021 WL 1171504, at *14 (D. Ariz. Mar. 29, 2021) (collecting cases deeming a party's lack of response as a concession of the validity of an opposing party's argument on the merits).

Defendants argue that (1) a housing audit would not chill a person of ordinary firmness, (2) there was no retaliatory animus behind the housing audit, and (3) there is no but-for causation linking the housing audit to Plaintiffs' protected activity.

### i.   Chilling Adverse Action

Defendants argue that a PHD financial audit would not chill a person of ordinary firmness from continuing to engage in protected activity. (Doc. 163 at 26.) According to Defendants, the audit was "merely a request that Plaintiffs bring forward documentation proving that two sets of deposits, shown by records voluntarily handed to PHD, were in fact loans or inheritances as the Plaintiffs claimed." (*Id.* at 27.)

An essential element of a First Amendment retaliation claim is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Env'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999). "Some retaliatory actions—even if they actually have the effect of chilling a plaintiff's speech—are too trivial or minor to be actionable as violations of the First Amendment." *Dudley*, 2008 WL 3890664, at *8 (D. Ariz. Aug. 20, 2008) *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (9th Cir. 2005) (finding that a "de minimis inconvenience to [the] exercise of First Amendment rights" is not actionable); *but see Ulrich,* 308 F.3d at 977 ("The denial of even a 'trivial' benefit may form the basis for a First Amendment claim where the aim is to punish protected speech.").

Here, the relevant facts in evidence are that on February 11, 2019, Plaintiffs received a 14-day eviction notice for failure to pay their rent on time. (Doc. 14 at 109.) In response

to the letter, Plaintiffs contacted Defendant Hogan, who set up a meeting to discuss the issue on March 6, 2019. (Doc. 136, ¶¶ 187–88.) This meeting was recorded, and a partial transcript has been made part of the record. (*See* Doc. 163-4 at 35–40.) Plaintiffs voluntarily furnished their bank statements to Defendant Hogan to prove that they paid their February 2019 rent. In reviewing the documentation, Defendant Hogan noticed that Plaintiffs appeared to have additional, unreported income in the form of several large deposits that would cause them to exceed the public housing income limits if no exceptions were met.[11] (Doc. 163-2 at 28–29); (Doc. 163-4 at 36–37); (Doc. 136, ¶ 189.) Plaintiff Czyzewski claimed that the money came from an inheritance and loans that he had paid back. (Doc. 163-4 at 37–38.) As a follow up to the meeting, Defendant Hogan informed Plaintiffs that she needed to see additional documentation for the deposits to prove that they did not constitute additional income that would affect Plaintiffs' eligibility for public housing. (Doc. 136, ¶ 194.) On March 14, 2019, Defendant Hogan followed up with Plaintiffs over email requesting additional financial information about the deposits, including: "Bank statements from September to December[;] Verification of the date account was opened[;] [A] copy of the back of the check you provided to indicate the check was processed through the bank[; and] Loan Agreement between you and Christine Czyzewski." (Doc. 14 at 111.)

The Court finds that, under these facts, a person of ordinary firmness reasonably could have been chilled from engaging in future First Amendment conduct due to the financial audit because, as Defendants point out, the audit was directly related to their eligibility to remain in their income-subsidized housing. A jury could reasonably infer that subjecting a person to such a financial audit after receipt of two eviction notices would have more than a de minimis effect on them. *Ulrich,* 308 F.3d at 977 ("The denial of even a 'trivial' benefit may form the basis for a First Amendment claim where the aim is to punish protected speech."). Therefore, the Court declines to grant summary judgment in favor of Defendants on this basis.

---

[11] The specific amount of unreported income was filed under seal and the Court does not need to disclose it here.

### ii.    Retaliatory Animus

Defendants next argue that Plaintiffs have failed to establish that their protected activity was a substantial and motivating factor for the financial audit because there is no evidence of a retaliatory animus behind the audit. (Doc. 163 at 27–28.) Because Plaintiffs failed to respond to Defendants' arguments and evidence on this issue, the Court agrees. *Coszalter*, 320 F.3d at 978 ("[T]he totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive.").

The Court bases its decision on the following unrebutted facts laid out by Defendants. At Fillmore Gardens, notices for non-payment of rent are auto generated by the system when a tenant is not current on their rent. (Doc. 163-2 at 31–32.) Plaintiffs failed to pay their rent on time for February 2019, so they received an auto-generated notice of non-payment. (*Id.* at 32–33.) Upon receipt of Plaintiffs' request, Defendant Hogan agreed to meet with Plaintiffs about the notice. That meeting took place on March 6, 2019. At that meeting, Plaintiffs presented Defendant Hogan with unedited, unredacted bank statements to show that the rent money did leave their account, albeit late. (Doc. 163-4 at 36–40.) Upon review of those statements, Defendant Hogan noticed large, unreported deposits into Plaintiffs' account and initiated a routine audit to evaluate whether Plaintiffs were still eligible to remain in federally funded public housing in view of their additional unreported income. (*Id.*)

On May 28, 2019, Defendant Hogan sent an email to Defendant Grittman about the audit, summarizing that Plaintiffs had unreported income potentially exceeding public housing income limits and had failed to report it to management as required by the PHD Admissions and Continued Occupancy Policy ("ACOP"). (Doc. 163-4 at 43.) Defendant Hogan's letter informs Defendant Grittman of other irregularities in Plaintiffs' accounts that needed to be investigated further. (*Id.*) Defendant Grittman noted during her deposition that it is a violation of the model HUD lease to not report income within 30 days of receiving it. (Doc. 163-2 at 30.)

Plaintiffs' Response does argue, albeit in the context of their Freedom of Association claim, that PHD had no "authority to engage in an independent audit of a particular resident absent a regularly scheduled examination." (Doc. 182 at 6.) Plaintiffs' assert that this proposition, for which they offer no citations, and the timing of the audit with the prior eviction notices establishes that the audit was "nothing more than harassment." (*Id.*)

However, Defendants rebut Plaintiffs' argument with specific regulations authorizing PHD to engage in interim audits based on income information. (Doc. 184 at 13.) For example, HUD regulations authorize the housing authority to "conduct an interim reexamination of family income and composition" at any time. 24 C.F.R. § 982.516(c); *see also* 24 C.F.R. §§ 5.236(b)(3), 5.230(b)(2). Additionally, the ACOP states that "[i]f the family does not report the change [in income] timely and accurately [within 30 days] . . . [t]he Housing Department will review all sources of income and may include sources that would have been excluded if the change was reported timely and accurately." (Doc. 163-2 at 193.) Moreover, Plaintiffs do not dispute that they did not report changes to their income within 30 days or that Defendant Hogan only inquired about the deposits after Plaintiffs voluntarily submitted their unredacted financial statements to show that their February rent was paid. (*See* Doc. 184 at 13); *see Tapestry*, 2021 WL 1171504, at *14 (collecting cases deeming a party's lack of response as a concession as to the validity of an opposing party's argument on the merits).

Accordingly, the Court finds that, in view of the evidence presented by Defendants, Plaintiffs' TAC and briefing do not establish the existence of a disputed material fact as to whether Defendant Hogan had a retaliatory motive to conduct the audit into Plaintiffs' financials, where the audit was instigated by an auto-generated notice and conducted in accordance with PHD policy.

### iii.    But For Causation

The Court also finds that Plaintiffs cannot establish but for causation between the audit and their protected speech because Defendants have proffered unrebutted evidence

that the audit was based on HUD regulations and the ACOP. *See Sampson*, 974 F.3d at 1019. Publicly funded housing is a limited resource for those that cannot afford housing without government assistance. Only those persons who qualify for public housing under the relevant regulations should be eligible to enjoy its benefits. Plaintiffs voluntarily provided their unredacted bank statements with unexplained and unreported cash infusions that triggered an audit under the relevant policies. *See* 24 C.F.R. § 982.516(c); *see also* 24 C.F.R. §§ 5.236(b)(3), 5.230(b)(2); (Doc. 163-2 at 193.) Plaintiffs present no evidence that they were singled out for an audit or that others in the same position were not audited.

Accordingly, the Court grants Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment retaliation claim based on the PHD housing audit.

**D.    Freedom of Association**

Even if Defendants are not entitled to qualified immunity on Plaintiffs' First Amendment freedom of association claims, Defendants are still entitled to summary judgment on the merits as a matter of law. Among the rights protected by the First Amendment are the rights of individuals to speak and petition the government for the redress of grievances, and to engage in group efforts toward those ends without interference by the State. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Government action that infringes upon these freedoms may take numerous forms, including action that seeks to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, or trying to interfere with the internal organization of the group. *See id.* (citing cases).

**1.    Applicability of A.R.S. § 33-1381(B)**

Plaintiffs argue that the presumption of a retaliatory eviction under A.R.S. § 33-1381(B) operates to shift the burden on Plaintiffs' freedom of association claim to Defendants to prove that PHD's attempted eviction was not retaliation for Plaintiffs' involvement in the RC. (Doc. 182 at 6.) As noted by Defendants, however, Plaintiffs fail to explain this argument or provide relevant case law establishing a connection between the Arizona Residential Landlord and Tenant Act ("ARLTA") and Plaintiffs' federal

constitutional rights under the First Amendment. (Doc. 184 at 10.) Indeed, § 33-1381(B) requires a complaint about a violation for the presumption to operate—membership in a tenants' union is not sufficient to establish presumption of a retaliatory eviction under the clear language of the statute. A.R.S. § 33-1381(B). Regardless, because the Court finds no remedy for alleged constitutional violations of a person's freedom of association within the scheme of the ARLTA, as discussed in Part IV.E, *infra*, the Court declines to apply a presumption of retaliatory eviction in deciding whether this claim survives summary judgment.

## 2. Plaintiffs' Right to Organize

Defendants argue that Plaintiffs' freedom of association has not been meaningfully inhibited by Defendants' actions in disbanding the RC because Plaintiffs are "still free to write letters to HUD, … gather with other tenants … and attempt to organize with other tenants and make themselves heard by the PHD staff." (Doc. 163 at 32.) Plaintiffs respond that Defendants have continuously "impeded Plaintiffs' right to organize through their attempted evictions of Plaintiffs, the improper audit of Plaintiffs' financial standing, ignored work orders, and actively misleading the [HUD] to prevent oversight of their actions." (Doc. 182 at 4.) Defendants disagree, citing portions of the record to establish that Defendants actions against Plaintiffs were based on Plaintiffs' "personal behavior and not their membership with the RC." (Doc. 184 at 9.)

Plaintiffs assert that the attempted eviction in August 2018, coupled with statements that Defendants made "when forming their decision to attempt to evict Plaintiffs"[12] and the eviction board's eventual decision that eviction was unwarranted, demonstrate that "the eviction was premised on a desire to impede Plaintiffs' ability to organize and destroy the [RC]." (Doc. 182 at 4–5.) Defendants contend that the evidence establishes that Plaintiffs' eviction was solely because of Plaintiff Czyzewski's confrontation with Ms. Magaard, activity that is not subject to constitutional protection. (Doc. 184 at 9–10.) Additionally,

---

[12] Plaintiffs refer to the statements that Defendants Fernandez and Bosshart made to the police officers on June 21, 2018, that were captured on the police body camera footage, which the Court analyzed at length in Part IV.C.2.ii.a, *supra*.

Plaintiffs assert that Defendants' audit of Plaintiffs' financial statements in February 2019 only occurred after Defendants attempted to evict Plaintiffs and evidenced their intent to disband the RC, in a further attempt to prevent Plaintiffs from continuing to participate in the RC. (Doc. 182 at 5–6.) In Defendants' view, the financial audit was the result of Plaintiffs' failure to pay their rent on time and their inability to explain large deposits in their bank account. (Doc. 184 at 11.) The Court has already addressed these arguments above in Parts IV.C.2 and IV.C.3, respectively. Because Plaintiffs also attempt to use this same evidence to establish retaliation for RC activism, apart from their protected speech, the Court addresses those arguments here as well.

The Court finds that Plaintiffs have failed to establish a disputed issue of material fact as to whether the attempted eviction or the financial audit were motivated by Plaintiffs' involvement in the RC. The statements made by Defendants in deciding to evict Plaintiffs do not rise to the level of a constitutional violation, for the reasons discussed in Part IV.C.2, *supra*. Additionally, as previously discussed, there is evidence in the record of Plaintiffs' repeated harassment of PHD staff and violations of PHD policies that would warrant the adverse actions taken against them in order for PHD personnel to maintain a safe environment at Fillmore Gardens. Nothing in the record suggests, even when viewed in the light most favorable to Plaintiffs, that the eviction or the financial audit were motivated by PHD's desire to retaliate against Plaintiffs for their participation in the RC or curb their ability to petition the government for redress. Notably, although Plaintiffs allege that PHD took these actions against them solely because of their participation in the RC, Plaintiffs admit that no adverse action was taken against Ms. Magaard due to their altercation at the meeting. (*See* Doc. 182 at 5.) Indeed, there is no evidence in the record that any of the other members of the RC were subject to any alleged retaliation for their involvement with the RC. Finally, although Plaintiffs vaguely contend that their work orders were ignored in an effort to retaliate against their involvement in the RC, Plaintiffs' own exhibits provide evidence establishing that Defendants actively responded to Plaintiffs' work orders in a timely fashion. (*See* Doc. 14 at 43–44) (email from Defendant Fernandez to Plaintiff

1  Bollfrass explaining the status of each work order request that Plaintiffs' now claim were

2  ignored).

3        Additionally, the Court finds that Plaintiffs' reliance on *Carrera v. Yepez*, 6 S.W.3d

4  654 (Tex. 1999) to support their argument is misplaced. *Id.* at 665. As Defendants note,

5  Plaintiffs misquote the holding of *Carrera* and instead point to a summary of the plaintiff's

6  arguments addressing why summary judgment was not proper in that case. (*See* Doc. 182

7  at 6–7.) Moreover, Plaintiff includes several quotes from *Carrera* about what the court

8  there determined but does not sufficiently link any of those quotes to actual evidence here.

9  The available evidence of Defendants' alleged retaliation in this case is sufficiently

10  different from that in *Carrera* such that the Court finds the case easily distinguishable and

11  declines to follow it.[13]

12             **3.**      **Plaintiffs' Notice of Claim**

13        Plaintiffs hold up a March 7, 2019, letter from HUD stating that HUD has been

14  informed of Plaintiff's lawsuit against PHD and as a result, "HUD will no longer be able

15  to intervene while this issue is resolved through litigation" as evidence that PHD was

16  interfering with Plaintiffs' attempts to report violations to HUD. (Doc. 182 at 6.) According

17  to Plaintiffs, because the lawsuit was not filed until April 16, 2019, PHD lied to HUD about

18  the existence of a lawsuit to prevent HUD from responding to Plaintiffs' October 23, 2018,

19  letter alleging that PHS discriminated against Plaintiffs and violated their First Amendment

20  rights. (*Id.*) Defendants point out that Plaintiffs submitted a Notice of Claim on December

21  20, 2018 which informed PHD of Plaintiff's intent to initiate of a lawsuit prior to HUD's

22  response letter in March 2019. (Doc. 163 at 33–34) (citing Doc. 163-2 at 493, 495).

23  Accordingly, the Court declines to give Plaintiff favorable inferences on this issue where

24  they are clearly contradicted by the record evidence. *See Scott*, 550 U.S. at 380.

25

26

27  [13] For example, in *Carrera*, a former employee of the housing department testified to
repeated statements by the housing director that explicitly evidenced his desire to remove
persons from the residents' council and get them evicted to prevent their participation.

28  *Carrera*, 6 S.W.3d at 657–59. Such evidence is not before this Court. Regardless, this
Court is not bound to follow decisions of the State of Texas Court of Appeals.

1          **4.      HUD Regulations**

2          Finally, Plaintiffs contend that Defendants acted to shut down the RC and prevent

3   future involvement in violation of Plaintiffs' constitutional rights. (Doc. 136, ¶¶ 208–18.)

4   Plaintiffs reference a series of events that took place while they were both involved with

5   the RC. Beginning in November 2016, Plaintiff Bollfrass began to help organize a new RC

6   at Fillmore Gardens. (Doc. 163-3 at 12–17.) For the next six months, Plaintiffs worked

7   with PHD staff to form the RC. (*Id.* at 19–37.) On April 21, 2017, PHD entered into a

8   Memorandum of Understanding ("MOU") to formally recognize the RC. (*Id.* at 45–57.)

9   Pursuant to the MOU, the RC agreed to abide by its by-laws and applicable federal

10  regulations governing RCs. (*Id.*)

11         Defendants argue that PHD properly acted to disband the RC based on its violation

12  of several mandatory HUD regulations, not because they wanted to retaliate against the RC

13  members. (Doc. 163 at 32–33.) Defendants further argue that the RC, as a recipient of

14  government funds, is uniquely situated such that the government is allowed to impose

15  regulations on its operation that may otherwise be inappropriate for non-government

16  funded entities. (*Id.*)

17         Plaintiffs' Response fails to address Defendants' arguments, and Defendants

18  contend that summary judgment is appropriate on those grounds based on Plaintiffs'

19  concession of these arguments. (Doc. 184 at 8–9.) Accordingly, the Court will only address

20  Defendants' arguments briefly in the absence of rebuttal from Plaintiffs. *See Tapestry*,

21  2021 WL 1171504, at *14.

22         Defendants' unrebutted evidence establishes that PHD was acting in accordance

23  with HUD regulations and the RC was effectively shut down after repeated failures to

24  comply with the rules. Drawing on Plaintiffs' TAC, Plaintiffs point to a September 7, 2018

25  letter from Defendant Fernandez that Plaintiffs contend was a public attempt to scare

26  residents from participating in the RC. The letter, however, was in response to Plaintiff

27  Bollfrass's emails that multiple RC members resigned, and that the RC has been using its

28  funds to host resident games. (Doc. 14 at 103.) Regarding the council members'

resignations, the letter details that for the RC "to remain operational," there must be five officers. (*Id.*) Because those resignations were "effective immediately," the RC "was potentially operating outside of the prescribed agreement, and therefore would not be recognized as a duly-elected" RC. (*Id.*) The letter also requests that any elections for new members be held in accordance with HUD regulations, because a failure to do so would result in a required withdrawal of "recognition of the [RC]" and a withholding of "Resident Participation funds." (*Id.*) Additionally, the letter notes that HUD regulations and the MOU require an accounting of Resident Participation funds and requests an audit of RC funds because "[s]ocial and entertainment activities such as bingo and the distribution of funds directly to residents," as planned by the RC, "are not activities supported with Tenant Participation Funding." (*Id.* at 104.)

The Court finds that PHD's response to the resignation of RC members and misuse of funds would not lead a reasonable jury to conclude that PHD was attempting to shut down the RC to prevent protected speech or otherwise discourage tenants' from exercising their First Amendment rights. Plaintiffs' conclusory arguments are not enough to withstand summary judgment on this issue where they fail to put forth credible evidence to raise a disputed material fact. *See Scott*, 550 U.S. at 380.

At oral argument, Plaintiffs also pointed to a letter from Defendant Montgomery as evidence that PHD violated their First Amendment rights by explicitly preventing them from engaging in protected conduct as an RC, *i.e.*, filing a lawsuit. The letter Plaintiffs' reference, however, states:

> An additional item mentioned in your letter concerns the resident in unit #236 and your planned efforts of "filing a court action" to "get him evicted." A review of your resident file demonstrates you were issued a Lease Violation Notice on April 10, 2018, in part for calling this resident an expletive while at a Tenant Council event in your capacity as President. The Notice warned that harassing behavior violated the Model Lease and Rules and Regulations. As a result, you wrote and delivered a letter of apology to the resident on April 13, 2018. Please be aware that your planned efforts described in your

> letter could be considered further harassment and a violation of
> the Lease.

(Doc. 14 at 70.) The Court finds that read in context, Defendant Montgomery's words do not raise a disputed issue of fact regarding whether his letter was intended to chill Plaintiffs' ability to engage in constitutionally protected activity under the First Amendment. Instead, the letter is further evidence that Plaintiff Bollfrass engaged in behavior that violated PHD regulations in his capacity as president of the RC.

In the absence of additional evidence, the Court finds that summary judgment is warranted on Plaintiffs' freedom of association claim in favor of Defendants.

### E. State Law Retaliation Claim

Plaintiffs' TAC alleges that Defendants violated the ARLTA, A.R.S. § 33-1381(A)(1)-(4), by attempting to evict Plaintiffs after they complained to PHD and HUD about conditions at Fillmore Gardens and became involved with the RC. (Doc. 136, ¶¶ 232–36.)

Section 33-1381(A)(1)-(4) states:

> [A] landlord may not retaliate by increasing rent or decreasing services or by bringing or threatening to bring an action for possession after … (1) [t]he tenant has complained to a governmental agency charged with responsibility for enforcement of a building or housing code of a violation applicable to the premises materially affecting health and safety; (2) [t]he tenant has complained to the landlord of a violation under § 33-1324[14]; (3) [t]he tenant has organized or become a member of a tenants' union or similar organization; [or] (4) [t]he tenant has complained to a governmental agency charged with the responsibility for enforcement of the wage-price stabilization act.

If a landlord violates § 33-1381(A) by engaging in retaliatory conduct against the tenant, the tenant may be entitled to the remedies enumerated in A.R.S. § 33-1367 (the

---

[14] A.R.S. § 33-1324 provides, among other things, that the landlord shall comply with the requirements of applicable building codes materially affecting health and safety, and that the landlord shall make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition.

"remedies statute"). *See* A.R.S. § 33-1381(B). The remedies statute states:

> If the landlord unlawfully removes or excludes the tenant from the premises or willfully diminishes services to the tenant by interrupting or causing the interruption of electric, gas, water or other essential service to the tenant, the tenant may recover possession or terminate the rental agreement and, in either case, recover an amount not more than two months' periodic rent or twice the actual damages sustained by him, whichever is greater….

A.R.S. § 33-1367. The parties dispute whether other civil remedies are available to Plaintiffs under § 33-1381.

At the motion to dismiss stage, this Court found that Plaintiffs stated a plausible claim for relief under the statute in view of their allegations that they had been ousted from their property for two months pending eviction. (Doc. 90 at 35); (*see also* Doc. 57, ¶ 153) ("As a result of the arrest Plaintiffs were forced out of their home at Fillmore Gardens for approximately two months."). The Court relied on *Thomas v. Goudreault* to find that § 33-1381 provides a cause of action for tenants without a corresponding eviction if there is any deprivation of a property interest, such that retaliatory damages were available to Plaintiffs under § 13-1367 even though they were not actually evicted. (*Id.*) The Court noted, however, that the *Thomas* court was not confronted with the issue of implied remedies raised here. (*Id.*)

On summary judgment, Defendants argue that the Court erred by relying on *Thomas* because it is contradicted by an Arizona Supreme Court case that explicitly addresses the issue of implied remedies. (Doc. 163 at 37; Doc. 184 at 17.) Defendants point to *Schaefer v. Murphey*, which held that a plaintiff must establish "an unlawful ouster" to be eligible for remedies under § 33-1367, and retaliatory conduct asserted under § 33-1381 is not enough in the absence of actual ouster. 640 P.2d 857, 861 (Ariz. 1982) ("Despite the availability of corresponding remedies under the unlawful ouster and retaliatory conduct statutes, they are not equivalent since both provisions proscribe different conduct.").

Additionally, Defendants point out that other than the allegations in Plaintiffs' TAC that they were "forced out of their home at Fillmore Gardens for approximately two months" following Plaintiff Czyzewski's arrest until the PHD Grievance Panel overturned the eviction notice (*see also* Doc. 57, ¶ 153), Plaintiffs have failed to bring forward any evidence that they were actually prevented from accessing their apartment pending the eviction proceedings, (Doc. 163 at 37–38.)

The Court agrees with Defendants that *Schaefer* is controlling here. Plaintiffs' Response fails to address Defendants' argument on this point, instead arguing that "the Court already rejected this argument in denying Defendants' Motion to Dismiss." (Doc. 182 at 11.) The Court notes, as discussed above, that the standards are different for motions to dismiss and motions for summary judgment. At this stage, the Court has been presented with evidence from both parties and does not rely solely on the assertions in Plaintiffs' complaint. Moreover, the non-moving party must produce affirmative evidence to rebut the moving party's motion to withstand summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 257. Plaintiffs fail to present any additional evidence to rebut Defendants' assertion that they were not actually deprived of access to their apartment prior to the eviction proceedings.

Thus, the Court finds that Defendants have met their burden to establish that there are no remaining disputed issues of fact as to whether Plaintiffs were subject to an unlawful ouster that would entitle them to remedies under §§ 33-1381 and 33-1367. Thus, the Court finds that Plaintiffs have not established entitlement to remedies for state law retaliation as a matter of law.

Because the Court grants Defendants' Motion for Summary Judgment on Plaintiffs' state law retaliation claim, the Court need not address whether Plaintiff is entitled to a presumption of retaliation for its state law claim under the same statute.

### F.    *Monell* Claims

Plaintiffs assert *Monell* claims based on "grossly inadequate training and/or because of acts directly from and/or directed by Housing Director Cindy Stotler, Deputy Housing

- 49 -

Director William Emmerson and Housing Manager Veronica Grittman, all of whom are policy makers." (Doc. 182 at 18.) Plaintiffs also appear to assert a *Monell* claim based on Plaintiff Czyzewski's arrest. (Doc. 136, ¶¶ 216–29; Doc. 182 at 21.)

Defendants argue that they are entitled to summary judgment on the *Monell* claims based on PHD employee conduct because Plaintiffs have not established that any of the individual defendants are "final policymakers" under Arizona law, or shown any evidence of an unconstitutional PHD policy that was applied to them. (Doc. 163 at 41.) Defendants also argue that Plaintiffs' *Monell* claim based on Plaintiff Czyzewski's arrest fails because Plaintiffs have not produced evidence of "an official and premeditated policy of intimidation [] enacted to retaliate against" Plaintiff's prior protected speech. (Doc. 163 at 42.) Defendants also note that Plaintiffs failed to raise any failure to train claims related to Plaintiff Czyzewski's arrest in their TAC. (Doc. 184 at 6.)

### 1. Legal Standard

To succeed under *Monell*, Plaintiffs "must show that their injury was caused by a municipal policy or custom." *Los Angeles County v. Humphries*, 562 U.S. 29, 30–31 (2010). A municipal policy is "a deliberate choice to follow a course of action … by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). There are three ways that a municipal entity may be held liable under *Monell*: (1) when the entity acts "pursuant to an expressly adopted policy;" (2) when there is a "longstanding practice or custom," including a failure "to implement procedural safeguards to prevent constitutional violations" or to adequately train its employees; and (3) "when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gordon v. County of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (quotations and citations omitted).

1

2

    **2.**  **PHD Directors**

     **i.**  **Final Policy Makers**

3

4

5

6

  Plaintiffs contend that there are disputed issues of fact regarding whether Defendants Grittman (Housing Manager), Montgomery (Deputy Director), and Emmerson (Housing Director) constitute final policymakers, such that their actions toward Plaintiffs, or the actions of their subordinates, would establish *Monell* liability. (Doc. 182 at 18.)

7

8

9

10

11

12

13

  Because this Court must look to Arizona law to determine whether a municipal employee is a final policymaker, *Sabra v. Maricopa Cnty. Comm. Coll. Dist.*, --- F.4th ---, No. 20-16774, 2022 WL 3222451 (9th Cir. 2022), Defendants argue that Arizona law clearly precludes a finding that any of the individual defendants are final policymakers for PHD or the City of Phoenix. (Doc. 163 at 42.) Defendants rely on Phoenix City Code Ch. 2 Art. 10 § 2-178 and *Puente v. City of Phoenix*, No. CV-18-02778-PHX-JJT, 2022 WL 357351 (D. Ariz. Feb. 7, 2022).

14

15

16

17

18

19

20

21

22

23

  Under the City Code, the Assisted Housing Governing Board ("AHGB") is the designated body tasked with establishing "operating policies for assisted housing facilities and services within and without the City as the developing assisted housing needs may require." Phoenix City Code Ch. 2 Art. 10 § 2-178(A)(2). The AHGB consists of the Mayor, the City Council members, and "a recipient of assisted housing benefits." *Id.* § 2-176. The Housing Director's only role with respect to the AHGB is to appoint the board member who receives assisted housing benefits. *See id.* No other housing department employees are mentioned in the City Code. Further, the City of Phoenix Charter vests final policymaking authority with the City Manager, the City Council, and the Mayor. *See* Phoenix City Charter, Ch. III §§ 1, 2; *see also Puente*, 2022 WL 357351, at *16.

24

25

26

27

28

  Plaintiffs respond, without explanation, that "the Public Housing Director and/or Housing Manager in this case is equivalent of the City Manager and its relation to the Assisted Housing Board." (Doc. 195 at 2.) The Court finds that, in view of the City Charter and City Code clearly vesting policymaking authority with the AHGB for assisted housing specifically, and the City Manager, for the City of Phoenix generally, this argument lacks

merit.

Plaintiffs have not alleged that anyone with actual final policy-making authority committed a constitutional violation against them, nor have they alleged that any of those persons "ratified a subordinate's unconstitutional decision or action and the basis for it." *See Gordon*, 6 F.4th at 974. Pointing to the conduct of the Housing Director or Housing Manager is not enough to attach liability to the City of Phoenix or PHD without evidence that their conduct was ratified by the final policymakers for those entities. Therefore, Defendants are entitled to summary judgment on this issue.

### ii.    Longstanding Practice or Custom

Plaintiffs argue that "PHD engage[d] in a pattern and policy of retaliation and harassment against Plaintiffs" to stifle the exercise of their First Amendment rights, including two attempted evictions, a financial audit, and public discouragement of RC participation. (Doc. 182 at 20.) In Plaintiffs' view, the extensive nature of PHD employees' conduct constituted an official policy of retaliation against Plaintiffs, such that an official policymaker's action is not required to attach *Monell* liability to PHD and the City of Phoenix. (*Id.* at 21.) A plausible reading of Plaintiffs' TAC and Response suggests that Plaintiffs intend to assert an argument under the "longstanding practice or custom" prong, including a claim for failure to train PHD employees, and not the "pursuant to an expressly adopted policy" prong.[15]

Defendants argue that Plaintiffs have not identified any evidence that such a policy caused a constitutional violation. (Doc. 163 at 41.) Instead, Defendants rely on deposition testimony and emails from PHD in the record for their contention that PHD actively encouraged Plaintiffs' lease violation reports and formation of the RC. (*Id.*)

"Establishing municipal liability through the existence of longstanding practice or custom is predicated 'on the theory that the relevant practice is so widespread as to have the force of law.'" *Sabra*, 2022 WL 3222451, at *11 (quoting *Bd. of Comm'rs v. Brown*,

---

[15] To the extent that Plaintiffs' Response to Defendants' Notice of Supplemental Authority attempts to argue for the first time that PHD's policies and regulations expressly prohibit First Amendment rights or are otherwise facially unconstitutional, such an argument is waived for Plaintiffs' failure to timely raise it. (*See* Doc. 197 at 2.)

520 U.S. 397, 404 (1997)). "Plaintiffs cannot allege a widespread practice or custom based on 'isolated or sporadic incidents; [liability] must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy.'" *Id.* (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)); *see Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom."). Moreover, Plaintiffs must prove that "the policy is the moving force behind the constitutional violation." *Gordon*, 6 F.4th at 973.

Although Plaintiffs allege that various PHD employees have harmed them, they fail to present credible evidence that PHD or its policymakers, as discussed above, have a "permanent and well settled policy" of First Amendment retaliation sufficient to rebut other evidence in the record that PHD and its staff followed official PHD regulations pertaining to tenant lease violations and RC operations and actively encouraged residents to report lease violations and participate in the RC. (*See* Doc. 163-2 at 9–11, 420–22, 426–48.); *Liberty Lobby, Inc.*, 477 U.S. at 252 (holding that the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"). Plaintiffs have alleged no more than "isolated or sporadic incidents" insufficient to establish *Monell* liability at this stage without additional evidence for a reasonable jury to infer that such conduct was widespread throughout PHD. *See Trevino*, 99 F.3d at 918.

### iii.     Failure to Train

*Monell* liability may attach to an entity if it "fails to implement procedural safeguards to prevent constitutional violations" or "fails to train its employees adequately." *Trevino*, 99 F.3d at 918. Other than a conclusory statement in its Response that "*Monell* liability has been established … through the grossly inadequate training" by Defendants Stotler, Emmerson, and Grittman (Doc. 182 at 18), and a heading in the TAC that includes "Failure to Train," Plaintiffs only allegations relating to *Monell* liability for failure to train are that "Defendants [Stotler, Emmerson, Montgomery, Grittman, Fernandez, Hogan, and

Bosshart] … have oversight and supervisory responsibility over … the proper screening, hiring, training, retaining, and supervision of the officers, employees, and agents with responsibility." (Doc. 136 at 44.) Plaintiffs' own Partial Motion for Summary Judgment does not address their *Monell* claims or cite to any evidence pertaining to Defendants' alleged failure to train.

In Plaintiffs' Response to Defendants' Notice of Supplemental Authority, Plaintiffs vaguely argue that "there are several instances throughout the record the [sic] demonstrate the utter incompetence of the Defendants' comprehension of rights protected by the First Amendment to the point that they were caught on camera conspiring with police to violate the same." (Doc. 197 at 2.) As discussed above in Part IV.C.2, *supra*, however, the Court has reviewed the body camera footage transcript that Plaintiffs reference and does not find a disputed issue of material fact as to whether those statements rose to the level of a constitutional violation or conspiracy to commit the same. Plaintiffs fail to explain what other evidence shows an obvious need for PHD employee training on First Amendment protections. Plaintiffs additionally assert that they are entitled to summary judgment on this issue "considering there is no evidence of any training in the record with regard to First Amendment protections." (Doc. 197 at 2.) The Court finds that such a conclusory argument lacks merit without Plaintiffs' explanation as to whether they attempted to discover any such evidence.

Thus, the Court finds that summary judgment in favor of Defendants is warranted in the absence of evidence related to any PHD employee training, or lack thereof, or evidence of other conduct within PHD similar to the constitutional violations alleged here. On the record before the Court, "Plaintiffs do not provide sufficient evidence from which a reasonable jury could find that 'the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Puente*, 2022 WL 357351, at *17 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

### 3.    Plaintiff Czyzewski's Arrest

Defendants argue that Plaintiffs' claim for retaliatory arrest fails under *Lozman v. City of Riviera Beach*, --- U.S. ---, 138 S.Ct. 1945 (2018), because Plaintiffs failed to present evidence that a "secret premediated arraignment agreed to by high-ranking officials" led to Plaintiff Czyzewski's arrest. (Doc. 163 at 42.)

Plaintiffs assert that Plaintiff Czyzewski was arrested because of his RC participation in violation of his First Amendment right to organize. (Doc. 182 at 21.) According to Plaintiffs, the City of Phoenix is liable because it failed to train the arresting officers on discrimination and the First Amendment. (*Id.*) In support of their position, Plaintiffs cite to the depositions of the arresting officers, Martin and McAbee, where they express uncertainty about the application of the First Amendment right to organize to their authority to make arrests. (Doc. 182 at 21.)

In reply, Defendants note that Plaintiffs attempt to assert a failure to train argument for the first time in their response brief, and that Plaintiffs did not assert such a claim in their TAC. (Doc. 184 at 6.) Defendants also contend that Plaintiffs Response fails to address Defendants' retaliatory arrest arguments, such that they are waived. (*Id.*)

The Court finds that Plaintiffs have failed to establish a disputed issue of fact under either theory. Under *Lozman*, Plaintiffs have not raised a disputed issue of fact as to whether Plaintiff Czyzewski's alleged wrongful arrest was due to "an official policy motivated by retaliation," because, as discussed above, the Court finds that Plaintiff Czyzewski's arrest (and corresponding eviction) was a result of his altercation with Ms. Magaard, not because he engaged in protected speech. *See supra*, Part IV.C.2; *see also Lozman*, --- U.S. ---, 138 S.Ct. at 1948 (remanding for the lower court to determine "whether, under *Mt. Healthy*, the City has proved that it would have arrested Lozman regardless of any retaliatory animus"). Regarding the newly asserted failure to train claim, Plaintiff have not alleged that the City of Phoenix's failure to train these two police officers "amount[s] to the local government's own official policy" of not training any officers on First Amendment rights or a widespread training deficiency within the Phoenix Police

1    Department. *See Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir.

2    1994) (granting summary judgment on a failure to train claim because the plaintiff did not

3    "allege a program-wide inadequacy in training").

4         Thus, the Court grants Defendants' Motion for Summary Judgment regarding

5    Plaintiffs' *Monell* claims based on Plaintiff Czyzewski's arrest.

6         **G.    Punitive Damages**

7         Defendants argue that Plaintiffs are not entitled to punitive damages under state or

8    federal law. (Doc. 163 at 43.) Because the Court finds no disputed issues of fact remain

9    and grants Defendants' Motion for Summary Judgment on all counts, the Court declines to

10   address Plaintiffs' entitlement to punitive damages.

11        **H.    Conclusion**

12        Based on the above reasoning, the Court grants Defendants' Motion for Summary

13   Judgment in its entirety.

14   **V.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

15        Plaintiffs filed a Motion for Partial Summary Judgment seeking resolution on three

16   issues: (A) Plaintiff Czyzewski's due process rights; (B) collateral estoppel regarding

17   Plaintiffs' eviction hearing; and (C) Defendants' alleged First Amendment retaliation

18   against Plaintiffs. (Doc. 165.)

19        **A.    Procedural Due Process**

20        Plaintiffs seek summary judgment on whether Defendants violated Plaintiff

21   Czyzewski's due process rights by terminating his RA position without notice and without

22   a hearing. (Doc. 165 at 16.) Each of Plaintiffs' arguments in their Motion were considered

23   and discussed in Part IV.B, *supra*, regarding Defendants' Motion for Summary Judgment.

24   As discussed, Defendants are entitled to summary judgment on Plaintiffs' due process

25   claim because Plaintiff Czyzewski did not have a constitutionally protected interest in the

26   continuation of his at-will employment relationship. Thus, the Court denies summary

27   judgment in favor of Plaintiffs on this issue.

28

1

### B. Collateral Estoppel

Plaintiffs argue that Defendants are collaterally estopped from disputing any of the facts established by the PHD Grievance Panel during Plaintiffs' eviction hearing. (Doc. 165 at 17.) According to Plaintiffs, because the Grievance Panel was acting in a judicial capacity and gave both parties "an adequate opportunity to litigate these factual issues before the Board," Defendants should be collaterally estopped from refuting the facts contained in the Independent Hearing Officer's ("IHO") Hearing Decision. (*Id*. at 18–19.)

The Hearing Decision recites the following "Summary of the Evidence":

> On June 21, 2018, [a] Fillmore Gardens Manager's meeting was held in the community room at 2:15 pm.
>
> Hearing Testimony: A verbal altercation occurred before the meeting started involving residents Frank Czyzewski and Donna Magaard. Three residents who attended the meeting testified under oath at the formal hearing to the following facts: Ms. Magaard started the altercation by banging the table and telling Mr. Gerald Bollfrass to "shut up". Mr. Czyzewski then told Ms. Magaard to "shut up" and both rose from the table and confronted each other from a distance of two feet. Mr. Czyzewski made fists during the confrontation. Ms. Dina Fernandez, Housing Supervisor, who attended the meeting told them to "stop" and Ms. Magaard left the room. Mr. Czyzewski apologized to those at the meeting. Ms. Magaard did not appear frightened but appeared aggressive. Ms. Magaard notified the police and Mr. Czyzewski was arrested. Mr. Czyzewski and Mr. Bollfrass, through their attorney presented a series of email from them to Housing Department management and an agenda for an Emergency Board meeting dated April 20, 2018[.]
>
> The City Housing Department presented an incident report and typed statement prepared by Donna Magaard, two incident reports from residents, an incident report from Housing Department staff, and a letter from the Project Manager of the Arizona Fair Housing Center. The City Housing Department also presented a narrative from a police officer called to the scene by Ms. Magaard. The written account provided by the City related [sic] a different set of facts, with Mr. Czyzewski as the aggressor who prevented Ms. Magaard from leaving. The City did not present any witnesses at the formal hearing.

(Doc. 14 at 93–94.) Regarding the Panel's decision, the Hearing Decision states: "[t]he Panel found that both Ms. Magaard and Mr. Czyzewski were at fault and that Ms. Magaard initiated the altercation." (*Id.* at 94.) Plaintiffs seek to rely on the IHO's recitation of facts and the Panel's findings in the Hearing Decision to support their argument that the 30-day eviction notice issued to Plaintiffs was Defendants' pretextual attempt to retaliate against Plaintiffs for protected speech. (Doc. 165 at 20.)

Defendants respond that the doctrine of collateral estoppel does not apply because Plaintiffs have waived it or, in the alternative, Plaintiffs have failed to establish each element of collateral estoppel. (Doc. 175 at 1–2.)

### 1.    Waiver

The parties dispute whether Plaintiffs waived their collateral estoppel argument by raising it for the first time on summary judgment. Defendants assert waiver because Plaintiffs failed to raise their collateral estoppel theory in their Mandatory Initial Discovery Responses ("MIDRs") or at the motion to dismiss stage. (*Id.* at 11.) Because this case is subject to the Mandatory Initial Discovery Pilot, the parties are required to provide relevant facts and underlying legal theories for each claim and defense raised. Gen. Order 17-08 at 2. Plaintiffs' First Supplemental MIDRs reference "[a]ll persons present at and who testified at," "[a]ll documents used by PHD at," and the partial recording of Plaintiffs' formal eviction hearing. (Doc. 175-2 at 10–11.) Moreover, Plaintiffs' MIDRs refer to Plaintiffs' Third Amended Complaint, which contains seven paragraphs detailing Plaintiffs' version of the facts surrounding the eviction hearing and what the board decided there. (Doc. 136, ¶¶ 162–68.) Defendants do not identify any facts that Plaintiffs rely on that are not included in Plaintiffs' MIDRs or the documents cited therein. Thus, the Court declines to find waiver on this basis.

Defendants also argue that Plaintiffs waived their estoppel argument because the factual findings from the eviction hearing are inconsistent with the facts as stated in the police report, which Plaintiff Czyzewski expressly admitted to when he entered his dismissal plea. (Doc. 175 at 11.) According to Defendants, *Heck v. Humphrey*, 512 U.S.

477 (1994), prevents Plaintiffs from asserting the facts determined at the eviction hearing in their lawsuit because they are inconsistent with the underlying factual basis for Plaintiff Czyzewski's plea. However, the Court agrees with Plaintiffs that Defendants' attempts to apply the *Heck* standard here fall short because the facts found in the eviction hearing and those admitted in Plaintiff Czyzewski's guilty plea are not inconsistent. (*Compare* Doc. 14 at 93–94 *with* Doc. 182-2 at 136–43.) Accordingly, the Court is not persuaded to find that Plaintiffs waived their argument for collateral estoppel.

### 2. Application of Collateral Estoppel

Defendants argue that application of collateral estoppel is not appropriate here because Arizona law precludes application of collateral estoppel in these circumstances, and, alternatively, that Plaintiffs have failed to establish all of the necessary elements. (Doc. 175 at 1–2.)

### i. Legal Standard

"Issue preclusion, or collateral estoppel, precludes relitigation of an issue already litigated and determined in a previous proceeding between the same parties." *Pike v. Hester*, 891 F.3d 1131, 1138 (9th Cir. 2018). As the parties asserting collateral estoppel, it is Plaintiffs' burden to prove all necessary elements of that defense. *Ctr. for Biological Diversity v. Zinke*, 399 F.Supp.3d 940, 945 (D. Ariz. 2019). "When an administrative agency [acts] in a judicial capacity and resolves disputes of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966); *see also Guild Wineries & Distilleries v. Whitehall Co.*, 853 F.2d 755, 758 (9th Cir. 1988) (quotations omitted). The Court is required to "give state court judgments the preclusive effect that those judgments would enjoy under the law of the state in which the judgment was rendered." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 993 (9th Cir. 2001).

### ii. Collateral Estoppel Under Arizona Law

Here, the eviction proceeding was held by a PHD Grievance Panel, and thus this

- 59 -

Court must apply Arizona law. Defendants contend that in Arizona, collateral estoppel is not applied to agency decisions where its application would result in manifest injustice. (Doc. 175 at 14.) Plaintiffs fail to provide a substantive reply and did not address this issue during oral argument, even after Defendants raised their argument again and explained the supporting law. (*See* Doc. 183 at 8.) Thus, in the absence of rebuttal arguments or contradictory case law interpretations from Plaintiff, the Court agrees with Defendants and finds that the application of collateral estoppel here would be unjust, as explained below.

Arizona generally endorses a "broad" and "expansive application of preclusion principles," and Arizona courts give "decisions of administrative agencies acting in quasi-judicial capacity" preclusive effect. *Hawkins v. Dep't of Econ. Sec.*, 900 P.2d 1236, 1239–40 (Ariz. Ct. App. 1995); *see also Perez v. Curcio*, 710 F.Supp. 259, 264–65 (D. Ariz. 1989). "Principles of issue preclusion should not be applied, however, where 'there is some overriding consideration of fairness to a litigant, which the circumstances of the particular case would dictate.'" *Ferris v. Hawkins*, 660 P.2d 1256, 1258 (Ariz. Ct. App. 1983) (quoting *Di Orio v. City of Scottsdale*, 408 P.2d 849, 852 (Ariz. 1965)). Collateral estoppel must not be "rigidly applied," and "must be qualified or rejected where [its] use would contravene an overriding public policy or result in manifest injustice." *Id.* at 1259 (quotations omitted).

Neither party has cited to a case applying collateral estoppel in the specific context of a city housing board's eviction hearings and the Court is not independently aware of any. However, Plaintiffs' Motion cites to *Perez v. Curcio* and Defendants rely on *Ferris v. Hawkins*, both of which are instructive.

In *Ferris*, the Arizona Court of Appeals surveyed several decisions from various other jurisdictions deciding whether to apply collateral estoppel to state administrative agency determinations in subsequent litigation. 660 P.2d at 1258–60. The *Ferris* court was persuaded by the reasoning that where the prior adjudication involved "distinct and separate" rights and remedies from those being litigated in the subsequent case, collateral estoppel should not be applied to bar parties from achieving "a full and fair opportunity to

1    independently present their respective claims in each forum." *Id.* at 1260. In so doing, the

2    *Ferris* court rejected the strict application of collateral estoppel applied in other

3    jurisdictions. *Id.*

4    In *Perez*, this Court declined to apply collateral estoppel to a City of Phoenix Civil

5    Service Board determination that the plaintiff was fired for good cause in plaintiff's

6    subsequent action for breach of her employment contract based on wrongful termination.

7    710 F.Supp. at 265. *Perez* reasoned that even though an essential element to plaintiff's

8    breach of contract claim was the cause of her termination, her lawsuit alleged that age

9    discrimination led to her termination and "absolutely no evidence was presented on the

10   issue of age discrimination and there were no findings of fact on this issue" at the Board

11   hearing level. *Id.* Therefore, *Perez* held that the plaintiff did not have "an adequate

12   opportunity to litigate the factual issues central to her breach of contract claim before the

13   Civil Service Board" so the resulting decision should not be given preclusive effect. *Id.*

14   Here, the Court declines to apply collateral estoppel because the Panel did not

15   actually litigate the issues in this action. Instead, the Panel was tasked with determining a

16   narrow issue—whether Plaintiffs' June 21, 2018 altercation with Ms. Magaard warranted

17   their eviction. (*See* Doc. 14 at 94.) The Grievance Panel was not asked to determine

18   whether there were any constitutional violations or retaliation against Plaintiffs. *See Ferris*,

19   660 P.2d at 1259. Based on this record, it does not appear that Plaintiffs raised any

20   constitutional issues at all during the eviction hearing.[16]

21   The Court finds that if it were to apply collateral estoppel to bar Defendants from

22   presenting evidence related to their defenses to Plaintiffs' First Amendment claims,

23   "manifest injustice" would result because Defendants would be deprived of any

24   opportunity to litigate those defenses. *See Ferris*, 660 P.2d at 1259 (declining to apply

25   collateral estoppel where the two actions involved "distinct legal rights" and remedies).

26   _____

27   [16] Although the Hearing Decision also states that "Mr. Czyzewski and Mr. Bollfrass . . . presented a series of emails from them to Housing Department management and an agenda for an Emergency Board meeting dated April 20, 2018," neither the Hearing Decision nor Plaintiffs' briefing explain the relevance of these documents or why they were submitted to the Grievance Panel, and the Court declines to speculate on Plaintiffs' intentions for presenting those documents. (*See* Doc. 14 at 94.)

28

The eviction hearing was not a proper forum for the parties to litigate their present dispute even though some of the underlying factual issues are common with those in this case. *See Garner v. Giarrusso*, 571 F.2d 1330, 1336 (5th Cir. 1978) (finding that a civil service commission was not a "competent forum" to resolve the parties federal employment discrimination claims). Moreover, not all the named defendants in this case were parties to the eviction hearing, and Plaintiffs fail to explain why their interests were fairly represented at the eviction hearing in their absence. Because the Court finds that Plaintiffs failed to establish that application of collateral estoppel would be appropriate under Arizona law, the Court need not reach the elements of the test for collateral estoppel.

### C.   First Amendment

Plaintiffs seek summary judgment on whether Defendants retaliated against Plaintiffs for "advocating for the tenants at Fillmore Gardens" in violation of the First Amendment. (Doc. 165 at 19–20.) Each of Plaintiffs' arguments (and each of Defendants' corresponding qualified immunity arguments) was considered and discussed above in Parts IV.A, IV.B, IV.C, and IV.D, regarding Defendants' Motion for Summary Judgment. As discussed therein, Defendants are entitled to summary judgment on Plaintiffs' First Amendment retaliation and freedom of association claims. Thus, the Court denies Plaintiff's Partial Summary Judgment Motion on this issue.

### D.   Conclusion

For the foregoing reasons, the Court denies Plaintiffs' Partial Motion for Summary Judgment in its entirety.

## VI.   CONCLUSION

Accordingly,

**IT IS ORDERED THAT** Defendants' Motion for Summary Judgment (Doc. 163, sealed, Doc. 164, unsealed) is **GRANTED**, as set forth above.

**IT IS FURTHER ORDERED THAT** Plaintiffs' Motion for Partial Summary Judgment (Doc. 165) is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Clerk of Court shall enter judgment in

favor of Defendants on all claims and close this case.

Dated this 16th day of September, 2022.

Michael T. Liburdi
United States District Judge